# VASQUEZ, WARDEN *v.* HILLERY

No. 84–836.   Argued October 15, 1985—Decided January 14, 1986

MARSHALL, J., delivered the opinion of the Court, in which BRENNAN, BLACKMUN, and STEVENS, JJ., joined, and in all but the sixth paragraph of Part III of which WHITE, J., joined. O'CONNOR, J., filed an opinion concurring in the judgment, *post*, p. 266. POWELL, J., filed a dissenting opinion, in which BURGER, C. J., and REHNQUIST, J., joined, *post*, p. 267.

*William George Prahl*, Supervising Deputy Attorney General of California, argued the cause for petitioner. With him on the brief was *John K. Van de Kamp*, Attorney General.

*Clifford Earl Tedmon*, by appointment of the Court, 471 U. S. 1002, argued the cause and filed a brief for respondent.*

JUSTICE MARSHALL delivered the opinion of the Court.

The Warden of San Quentin State Prison asks this Court to retire a doctrine of equal protection jurisprudence first announced in 1880. The time has come, he urges, for us to abandon the rule requiring reversal of the conviction of any defendant indicted by a grand jury from which members of his own race were systematically excluded.

## I

In 1962, the grand jury of Kings County, California, indicted respondent, Booker T. Hillery, for a brutal murder.

---

*\**Julius LeVonne Chambers, Steven L. Winter*, and *Anthony G. Amsterdam* filed a brief for the NAACP Legal Defense & Educational Fund, Inc., as *amicus curiae* urging affirmance.

Before trial in Superior Court, respondent moved to quash the indictment on the ground that it had been issued by a grand jury from which blacks had been systematically excluded. A hearing on respondent's motion was held by Judge Meredith Wingrove, who was the sole Superior Court Judge in the county and had personally selected all grand juries, including the one that indicted respondent, for the previous seven years. Absolving himself of any discriminatory intent, Judge Wingrove refused to quash the indictment.[1] Respondent was subsequently convicted of first-degree murder.

For the next 16 years, respondent pursued appeals and collateral relief in the state courts, raising at every opportunity his equal protection challenge to the grand jury that indicted him.[2] Less than one month after the California Supreme Court foreclosed his final avenue of state relief in 1978, respondent filed a petition for a writ of habeas corpus in federal court, raising that same challenge. The District Court concluded that respondent had established discrimination in the grand jury, and granted the writ. See *Hillery* v. *Pulley*, 563 F. Supp. 1228 (ED Cal. 1983). The Court of Appeals

---

[1] Three thorough and well-reasoned opinions of the District Court discuss in detail the evidence adduced at the hearing, as well as other aspects of the case. See *Hillery* v. *Pulley*, 563 F. Supp. 1228 (ED Cal. 1983); *Hillery* v. *Pulley*, 533 F. Supp. 1189 (ED Cal. 1982); *Hillery* v. *Sumner*, 496 F. Supp. 632 (ED Cal. 1980). We repeat here only those portions relevant to the issues before the Court.

[2] See *People* v. *Hillery*, 34 Cal. Rptr. 853, 386 P. 2d 477 (1963) (affirming conviction; rejecting discrimination claim); *People* v. *Hillery*, 62 Cal. 2d 692, 401 P. 2d 382 (1965) (on rehearing, rejecting discrimination claim; reversing sentence), cert. denied, 386 U. S. 938 (1967); *People* v. *Hillery*, 65 Cal. 2d 795, 423 P. 2d 208 (1967) (after remand, affirming sentence), cert. denied, 389 U. S. 986 (1968); *In re Hillery*, 71 Cal. 2d 857, 457 P. 2d 565 (1969) (on original petition for habeas corpus, reversing sentence); *People* v. *Hillery*, 10 Cal. 3d 897, 519 P. 2d 572 (1974) (after remand, reducing sentence); *In re Hillery*, Crim. No. 20424 (Cal. 1978) (affirming denial of state habeas corpus).

affirmed, 733 F. 2d 644 (CA9 1984), and we granted certiorari, 470 U. S. 1026 (1985).

## II

As a threshold matter, we turn to petitioner's contention that respondent has circumvented his obligation to exhaust state remedies before seeking collateral relief in federal court. 28 U. S. C. § 2254(b). The exhaustion issue had its genesis in this case when the Federal District Judge saw a need to "supplement and clarify" the state-court record presented for review. Record, Doc. No. 8, p. 2. Upon authority of 28 U. S. C. § 2254 Rule 7, the judge directed the State to provide more figures "demonstrating what portion of the Black population in Kings County was eligible for grand jury service." Record, Doc. No. 8, p. 3. He also directed the parties to present their views regarding the application of statistical probability analysis to the facts of this case, to assist him in "focus[ing] on the likelihood that chance or accident alone could account for the exclusion of a group from grand jury service." *Ibid.* Petitioner objects that the submissions made in response to the judge's order "drastically" altered respondent's claim and rendered it unsuitable for federal habeas review without prior consideration by the state courts. Brief for Petitioner 81.

The exhaustion doctrine seeks to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary. *Rose* v. *Lundy*, 455 U. S. 509, 515 (1982). Under standards established by this Court, a state prisoner may initiate a federal habeas petition "[o]nly if the state courts have had the first opportunity to hear the claim sought to be vindicated . . . ." *Picard* v. *Connor*, 404 U. S. 270, 276 (1971). "It follows, of course, that once the federal claim has been fairly presented to the state courts, the exhaustion requirement is satisfied." *Id.*, at 275; see also *Humphrey* v. *Cady*, 405 U. S. 504, 516–517, n. 18 (1972). We have never held that presentation

of additional facts to the district court, pursuant to that court's directions, evades the exhaustion requirement when the prisoner has presented the substance of his claim to the state courts. See *Picard, supra,* at 278.

Rule 7(b) permits a federal district court in a habeas proceeding to expand the existing record to "include, without limitation, . . . documents, exhibits, and answers under oath, if so directed, to written interrogatories propounded by the judge. Affidavits may be submitted and considered as a part of the record." In this case, the District Court sought to clarify the relevant facts, an endeavor wholly consistent with Rule 7 and the purpose of the writ. See *Townsend* v. *Sain,* 372 U. S. 293, 313 (1963). The sole question here is whether this valid exercise of the court's power to expand the record had the effect of undermining the policies of the exhaustion requirement.

Several affidavits challenged here as "new" evidence supported respondent's allegations that no black had ever served on the grand jury in Kings County and that qualified blacks in the county were available to serve, which he had pressed in his pretrial motion to quash in Superior Court, App. 28–30, and throughout the state proceedings. The California Supreme Court found that the total absence of blacks from the grand jury in the history of Kings County was an undisputed fact. *People* v. *Hillery,* 62 Cal. 2d 692, 709, 401 P. 2d 382, 392 (1965), cert. denied, 386 U. S. 938 (1967). That fact was entitled, therefore, to a presumption of correctness on federal review. *Sumner* v. *Mata,* 449 U. S. 539, 545–546 (1981); see *Hillery* v. *Pulley,* 533 F. Supp. 1189, 1201, n. 25 (ED Cal. 1982). The California Supreme Court also discussed Judge Wingrove's consideration of blacks' qualifications, and found that blacks had served as petit jurors, 62 Cal. 2d, at 710, 401 P. 2d, at 392–393, minimum eligibility requirements for which were substantially the same as for grand jurors, see 563 F. Supp., at 1245; Mar, The California Grand Jury: Vestige of Aristocracy, 1 Pac. L. J. 36, 40

(1970). Consequently, the additional affidavits introduced no claim upon which the state courts had not passed.

The remaining "new" evidence under attack, a computer analysis submitted in response to the District Court's request, assessed the mathematical probability that chance or accident could have accounted for the exclusion of blacks from the Kings County grand jury over the years at issue.[3] Petitioner would have us conclude that the "sophisticated computer techniques" rendered respondent's claim a "wholly different animal." Brief for Petitioner 80–81. These statistical estimates, however, added nothing to the case that this Court has not considered intrinsic to the consideration of any grand jury discrimination claim. As early as 1942, this Court rejected a contention that absence of blacks on the grand jury was insufficient to support an inference of discrimination, summarily asserting that "chance or accident could hardly have accounted for the continuous omission of negroes from the grand jury lists for so long a period as sixteen years or more." *Hill* v. *Texas*, 316 U. S. 400, 404 (1942). This proposition, which the Court derived solely on the basis of judicial intuition, is precisely what respondent sought to establish by methods now considered somewhat more reliable.

More recently, in reviewing a habeas corpus proceeding, this Court independently applied general statistical principles to the evidence on the record in order to assess the role of chance in the exclusion of Mexican-Americans from a grand jury in Texas. *Castaneda* v. *Partida*, 430 U. S. 482,

---

[3] The statistical expert concluded that if the grand juries selected in Kings County between 1900 and 1962 had been chosen by chance, the probability that no black would have been selected was 57 in 100,000 million. Although the State made no attempt to rebut this testimony, the District Court questioned the reliability of the expert's analysis, performed its own analysis of the data, and ultimately accepted the expert's conclusions only for the 7-year period of Judge Wingrove's tenure, which yielded a probability of 2 in 1,000 that the phenomenon was attributable to chance. 563 F. Supp., at 1241–1244.

496–497, n. 17 (1977). Form would indeed triumph over substance were we to allow the question of exhaustion to turn on whether a federal judge has relied on educated conjecture or has sought out a more sophisticated interpretative aid to accomplish the same objective.

We emphasize that the District Court's request for further information was evidently motivated by a responsible concern that it provide the meaningful federal review of constitutional claims that the writ of habeas corpus has contemplated throughout its history. 533 F. Supp., at 1202–1203; see *Townsend* v. *Sain, supra,* at 311–312. Respondent had initially submitted only the evidence that had been considered in state court, and subsequently complied with the court's request by furnishing materials no broader than necessary to meet the needs of the court. Accordingly, the circumstances present no occasion for the Court to consider a case in which the prisoner has attempted to expedite federal review by deliberately withholding essential facts from the state courts. We hold merely that the supplemental evidence presented by respondent did not fundamentally alter the legal claim already considered by the state courts, and, therefore, did not require that respondent be remitted to state court for consideration of that evidence.

## III

On the merits, petitioner urges this Court to find that discrimination in the grand jury amounted to harmless error in this case, claiming that the evidence against respondent was overwhelming and that discrimination no longer infects the selection of grand juries in Kings County. Respondent's conviction after a fair trial, we are told, purged any taint attributable to the indictment process. Our acceptance of this theory would require abandonment of more than a century of consistent precedent.

In 1880, this Court reversed a state conviction on the ground that the indictment charging the offense had been

issued by a grand jury from which blacks had been excluded. We reasoned that deliberate exclusion of blacks "is practically a brand upon them, affixed by the law, an assertion of their inferiority, and a stimulant to that race prejudice which is an impediment to securing to individuals of the race that equal justice which the law aims to secure to all others." *Strauder* v. *West Virginia*, 100 U. S. 303, 308 (1880).

Thereafter, the Court has repeatedly rejected all arguments that a conviction may stand despite racial discrimination in the selection of the grand jury. See, *e. g.*, *Neal* v. *Delaware*, 103 U. S. 370, 396 (1881); *Bush* v. *Kentucky*, 107 U. S. 110 (1883); *Gibson* v. *Mississippi*, 162 U. S. 565 (1896); *Carter* v. *Texas*, 177 U. S. 442 (1900); *Rogers* v. *Alabama*, 192 U. S. 226 (1904); *Pierre* v. *Louisiana*, 306 U. S. 354 (1939); *Smith* v. *Texas*, 311 U. S. 128 (1940); *Hill* v. *Texas, supra; Cassell* v. *Texas*, 339 U. S. 282 (1950); *Reece* v. *Georgia*, 350 U. S. 85 (1955); *Eubanks* v. *Louisiana*, 356 U. S. 584 (1958); *Arnold* v. *North Carolina*, 376 U. S. 773 (1964); *Alexander* v. *Louisiana*, 405 U. S. 625 (1972). Only six years ago, the Court explicitly addressed the question whether this unbroken line of case law should be reconsidered in favor of a harmless-error standard, and determined that it should not. *Rose* v. *Mitchell*, 443 U. S. 545 (1979).[4]

---

[4] The dissent attempts to lessen the precedential weight of *Mitchell* by characterizing it as an advisory opinion. *Post*, at 270, n. 4. In Part II of *Mitchell*, three Justices reaffirmed the principle that grand jury discrimination requires reversal of the conviction in all cases; in Parts III and IV, they concluded that the prisoner had failed to make out a prima facie case of discrimination. 443 U. S., at 574. Two additional Justices explicitly joined Part II, but dissented from the judgment because they believed that discrimination had been established, and that the conviction must, therefore, be reversed. *Id.*, at 588 (WHITE, J., joined by STEVENS, J., dissenting). The dissent here offers a citation to *Gregg* v. *Georgia*, 428 U. S. 153, 169, n. 15 (1976) (opinion of Stewart, POWELL, and STEVENS, JJ.), in support of its unprecedented argument that a statement of legal opinion joined by five Justices of this Court does not carry the force of law. The cited passage, however, refers only to the manner in which one may discern a single holding of the Court in cases in which no opinion on the

We reaffirmed our conviction that discrimination on the basis of race in the selection of grand jurors "strikes at the fundamental values of our judicial system and our society as a whole," and that the criminal defendant's right to equal protection of the laws has been denied when he is indicted by a grand jury from which members of a racial group purposefully have been excluded. *Id.*, at 556.

Petitioner argues here that requiring a State to retry a defendant, sometimes years later, imposes on it an unduly harsh penalty for a constitutional defect bearing no relation to the fundamental fairness of the trial. Yet intentional discrimination in the selection of grand jurors is a grave constitutional trespass, possible only under color of state authority, and wholly within the power of the State to prevent. Thus, the remedy we have embraced for over a century—the only effective remedy for this violation[5]—is not disproportionate to the evil that it seeks to deter. If grand jury discrimination becomes a thing of the past, no conviction will ever again be lost on account of it.

---

issue in question has garnered the support of a majority. That discussion is inapplicable to Part II of *Mitchell*, to which five Justices expressly subscribed.

[5] As we pointed out in *Rose* v. *Mitchell*, alternative remedies are ineffectual. Federal law provides a criminal prohibition against discrimination in the selection of grand jurors, 18 U. S. C. § 243, but according to statistics compiled by the Administrative Office of the United States Courts, that section has not been the basis for a single prosecution in the past nine years. With respect to prior years, for which precise information is not available, we have been unable to find evidence of any prosecution or conviction under the statute in the last century. The other putative remedy for grand jury discrimination is 42 U. S. C. § 1983, which, in theory, allows redress for blacks who have been excluded from grand jury service. See *Carter* v. *Jury Comm'n of Greene County*, 396 U. S. 320 (1970). These suits are also extremely rare, undoubtedly because the potential plaintiffs, eligible blacks not called for grand jury service, are often without knowledge of the discriminatory practices and without incentive to launch costly legal battles to stop them.

Nor are we persuaded that discrimination in the grand jury has no effect on the fairness of the criminal trials that result from that grand jury's actions. The grand jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not. In the hands of the grand jury lies the power to charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a noncapital offense—all on the basis of the same facts. Moreover, "[t]he grand jury is not bound to indict in every case where a conviction can be obtained." *United States* v. *Ciambrone*, 601 F. 2d 616, 629 (CA2 1979) (Friendly, J., dissenting). Thus, even if a grand jury's determination of probable cause is confirmed in hindsight by a conviction on the indicted offense, that confirmation in no way suggests that the discrimination did not impermissibly infect the framing of the indictment and, consequently, the nature or very existence of the proceedings to come.

When constitutional error calls into question the objectivity of those charged with bringing a defendant to judgment, a reviewing court can neither indulge a presumption of regularity nor evaluate the resulting harm. Accordingly, when the trial judge is discovered to have had some basis for rendering a biased judgment, his actual motivations are hidden from review, and we must presume that the process was impaired. See *Tumey* v. *Ohio*, 273 U. S. 510, 535 (1927) (reversal required when judge has financial interest in conviction, despite lack of indication that bias influenced decisions). Similarly, when a petit jury has been selected upon improper criteria or has been exposed to prejudicial publicity, we have required reversal of the conviction because the effect of the violation cannot be ascertained. See *Davis* v. *Georgia*, 429 U. S. 122 (1976) *(per curiam); Sheppard* v. *Maxwell*, 384 U. S. 333, 351–352 (1966). Like these fundamental flaws, which never have been thought harmless, discrimination in the grand jury undermines the structural integrity of the

criminal tribunal itself, and is not amenable to harmless-error review.[6]

Just as a conviction is void under the Equal Protection Clause if the prosecutor deliberately charged the defendant on account of his race, see *United States* v. *Batchelder*, 442 U. S. 114, 125, n. 9 (1979), a conviction cannot be understood to cure the taint attributable to a charging body selected on the basis of race. Once having found discrimination in the selection of a grand jury, we simply cannot know that the need to indict would have been assessed in the same way by a grand jury properly constituted. The overriding imperative to eliminate this systemic flaw in the charging process, as well as the difficulty of assessing its effect on any given defendant, requires our continued adherence to a rule of mandatory reversal.

The opinion of the Court in *Mitchell* ably presented other justifications, based on the necessity for vindicating Fourteenth Amendment rights, supporting a policy of automatic reversal in cases of grand jury discrimination. That analysis persuasively demonstrated that the justifications retain their validity in modern times, for "114 years after the close of the War Between the States and nearly 100 years after *Strauder*, racial and other forms of discrimination still remain a fact of life, in the administration of justice as in our society as a whole." 443 U. S., at 558–559. The six years since *Mitchell* have given us no reason to doubt the continuing truth of that observation.

IV

The dissent propounds a theory, not advanced by any party, which would condition the grant of relief upon the passage of time between a conviction and the filing of a petition for federal habeas corpus, depending upon the ability of a State to obtain a second conviction. Sound jurisprudence

---

[6] JUSTICE WHITE does not join in the foregoing paragraph.

counsels against our adoption of that approach to habeas corpus claims.

The Habeas Corpus Rules permit a State to move for dismissal of a habeas petition when it "has been prejudiced in its ability to respond to the petition by delay in its filing." 28 U. S. C. § 2254 Rule 9(a). Indeed, petitioner filed such a motion in this case, and it was denied because the District Court found that no prejudicial delay had been caused by respondent. *Hillery* v. *Sumner*, 496 F. Supp. 632, 637 (ED Cal. 1980). Congress has not seen fit, however, to provide the State with an additional defense to habeas corpus petitions based on the difficulties that it will face if forced to retry the defendant. The Judicial Conference Advisory Committee on Criminal Rules has drafted a proposed amendment to Rule 9(a), which would permit dismissal of a habeas corpus petition upon a demonstration that the State has been prejudiced, either in defending against the prisoner's federal claim or in bringing the prisoner to trial again should the federal claim prove meritorious. 52 U. S. L. W. 2145 (1983). That proposal has not been adopted. And, despite many attempts in recent years, Congress has yet to create a statute of limitations for federal habeas corpus actions. See L. Yackle, Postconviction Remedies § 19 (Supp. 1985) (describing relevant bills introduced in past several Congresses). We should not lightly create a new judicial rule, in the guise of constitutional interpretation, to achieve the same end.

## V

Today's decision is supported, though not compelled, by the important doctrine of *stare decisis*, the means by which we ensure that the law will not merely change erratically, but will develop in a principled and intelligible fashion. That doctrine permits society to presume that bedrock principles are founded in the law rather than in the proclivities of individuals, and thereby contributes to the integrity of our constitutional system of government, both in appearance and in

fact.   While *stare decisis* is not an inexorable command, the careful observer will discern that any detours from the straight path of *stare decisis* in our past have occurred for articulable reasons, and only when the Court has felt obliged "to bring its opinions into agreement with experience and with facts newly ascertained." *Burnet* v. *Coronado Oil & Gas Co.*, 285 U. S. 393, 412 (1932) (Brandeis, J., dissenting).

Our history does not impose any rigid formula to constrain the Court in the disposition of cases.   Rather, its lesson is that every successful proponent of overruling precedent has borne the heavy burden of persuading the Court that changes in society or in the law dictate that the values served by *stare decisis* yield in favor of a greater objective.   In the case of grand jury discrimination, we have been offered no reason to believe that any such metamorphosis has rendered the Court's long commitment to a rule of reversal outdated, illfounded, unworkable, or otherwise legitimately vulnerable to serious reconsideration.   On the contrary, the need for such a rule is as compelling today as it was at its inception.

The judgment of the Court of Appeals, accordingly, is affirmed.

*It is so ordered.*

JUSTICE O'CONNOR, concurring in the judgment.

This Court has long held that upon proof of systematic exclusion of blacks from a grand jury issuing an indictment, the admittedly costly remedy of reversal of a conviction thereafter obtained through a fair trial is necessary in order to eradicate and deter such discrimination.   Not until *Rose* v. *Mitchell*, 443 U. S. 545 (1979), however, did the Court squarely address the question whether, given the availability of this remedy on direct review, it is also necessary to make the same remedy available when the petitioner seeks to renew his claim of discriminatory exclusion on federal habeas corpus review.   See *id.*, at 582 (POWELL, J., concurring in judgment).

I share the view expressed by JUSTICE POWELL in *Rose:* a petitioner who has been afforded by the state courts a full

and fair opportunity to litigate the claim that blacks were discriminatorily excluded from the grand jury which issued the indictment should be foreclosed from relitigating that claim on federal habeas. The incremental value that continued challenges may have in rooting out and deterring such discrimination is outweighed by the unique considerations that apply when the habeas writ is invoked. The history and purposes of the writ, as well as weighty finality interests and considerations of federalism, counsel against permitting a petitioner to renew on habeas a challenge which does not undermine the justness of his trial, conviction, or incarceration. See *id.*, at 579–588.

In this case, the District Court held that respondent was not given a full and fair hearing on his discriminatory exclusion claim in state court. See *Hillery* v. *Pulley*, 563 F. Supp. 1228 (ED Cal. 1983). That holding was not altered on appeal, 733 F. 2d 644 (CA9 1984), nor is it challenged by the petitioner in this Court. Respondent's claim was therefore cognizable in federal habeas proceedings. Because I am not convinced that a sufficiently compelling case has been made for reversing this Court's precedents with respect to the remedy applicable to properly cognizable claims of discriminatory exclusion of grand jurors, I concur in the judgment of the Court.

JUSTICE POWELL, with whom THE CHIEF JUSTICE and JUSTICE REHNQUIST join, dissenting.

Respondent, a black man, was indicted by a grand jury having no black members for the stabbing murder of a 15-year-old girl. A petit jury found respondent guilty of that charge beyond a reasonable doubt, in a trial the fairness of which is unchallenged here.[1] Twenty-three years later, we are asked to grant respondent's petition for a writ of habeas

---

[1] Respondent was thrice sentenced to death for this murder. See *People* v. *Hillery*, 10 Cal. 3d 897, 519 P. 2d 572 (1974); *ante*, at 256, n. 2. That sentence was ultimately reduced to life imprisonment because the California Supreme Court found that imposition of the death penalty was in all cases inconsistent with the California Constitution. *Ibid.*

corpus—and thereby require a new trial if that is still feasible—on the ground that blacks were purposefully excluded from the grand jury that indicted him. It is undisputed that race discrimination has long since disappeared from the grand jury selection process in Kings County, California. It is undisputed that a grand jury that perfectly represented Kings County's population at the time of respondent's indictment would have contained only one black member.[2] Yet the Court holds that respondent's petition must be granted, and that respondent must be freed unless the State is able to reconvict, more than two decades after the murder that led to his incarceration.

It is difficult to reconcile this result with a rational system of justice. The Court nevertheless finds its decision compelled by a century of precedent and by the interests of respondent and of society in ending race discrimination in the selection of grand juries. I dissent for two reasons. First, in my view, any error in the selection of the grand jury that indicted respondent is constitutionally harmless. Second, even assuming that the harmless-error rule does not apply, reversal of respondent's conviction is an inappropriate remedy for the wrong that prompts this case.

I

The Court concludes that the harmless-error rule does not apply to claims of grand jury discrimination. *Ante*, at 261. This conclusion is said to follow from a line of cases going back over 100 years. *Ante*, at 260–261. In my view, it follows from a misapplication of the doctrine of *stare decisis*.

Adhering to precedent "is usually the wise policy, because in most matters it is more important that the applicable rule of law be settled than that it be settled right." *Burnet* v.

---

[2] According to 1960 census figures, 4.7% of Kings County's population over age 21 was black. *Hillery* v. *Pulley*, 563 F. Supp. 1228, 1232 (ED Cal. 1983). Respondent's grand jury consisted of 19 individuals, all of whom were white. *Id.*, at 1231.

*Coronado Oil & Gas Co.*, 285 U. S. 393, 406 (1932) (Brandeis, J., dissenting). Accordingly, "any departure from the doctrine of *stare decisis* demands special justification." *Arizona* v. *Rumsey*, 467 U. S. 203, 212 (1984); *Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U. S. 528, 559 (1985) (POWELL, J., dissenting). Nevertheless, when governing decisions are badly reasoned, or conflict with other, more recent authority, the Court "has never felt constrained to follow precedent." *Smith* v. *Allwright*, 321 U. S. 649, 665 (1944). Instead, particularly where constitutional issues are involved, "[t]his Court has shown a readiness to correct its errors even though of long standing." *United States* v. *Barnett*, 376 U. S. 681, 699 (1964). In this case, the Court misapplies *stare decisis* because it relies only on decisions concerning grand jury discrimination. There is other precedent, including important cases of more recent vintage than those cited by the Court, that should control this case. Those cases hold, or clearly imply, that a conviction should not be reversed for constitutional error where the error did not affect the outcome of the prosecution.

In *Chapman* v. *California*, 386 U. S. 18 (1967), the Court held that a trial judge's improper comment on the defendant's failure to testify—a clear violation of the Fifth and Fourteenth Amendments—was not a proper basis for reversal if harmless. *Id.*, at 21–24. Since *Chapman*, "the Court has consistently made clear that it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations." *United States* v. *Hasting*, 461 U. S. 499, 509 (1983). This rule has been applied to a variety of constitutional violations. See *Harrington* v. *California*, 395 U. S. 250 (1969) (use of co-conspirator confession in violation of Confrontation Clause); *Coleman* v. *Alabama*, 399 U. S. 1 (1970) (denial of counsel at preliminary hearing); *Milton* v. *Wainwright*, 407 U. S. 371 (1972) (use of confession obtained in violation of

right to counsel); *Gerstein* v. *Pugh*, 420 U. S. 103 (1975) (illegal arrest).

Other doctrines reflect the same principle. A defendant claiming ineffective assistance of counsel must show that counsel's incompetence caused him actual prejudice. *Strickland* v. *Washington*, 466 U. S. 668, 687 (1984). This is so even though counsel "made errors so serious that [he] was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Ibid.* [3] Similarly, a defendant who is barred by a procedural default from asserting a constitutional claim on direct appeal cannot raise the claim on habeas corpus without showing that the error actually prejudiced him. *United States* v. *Frady*, 456 U. S. 152, 170 (1982); see also *Wainwright* v. *Sykes*, 433 U. S. 72 (1977).

In *Rose* v. *Mitchell*, 443 U. S. 545 (1979), the Court contended that the principle of these cases is inapplicable to grand jury discrimination claims, because grand jury discrimination "destroys the appearance of justice and thereby casts doubt on the integrity of the judicial process." [4] *Id.*, at 555–556. But *every* constitutional error may be said to raise questions as to the "appearance of justice" and the "integrity

---

[3] As the Court stated in *Strickland*, "[w]hen a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." 466 U. S., at 695.

[4] Although all parts of JUSTICE BLACKMUN's opinion in *Rose* v. *Mitchell* were joined by four other Justices, its precedential weight is subject to some question. In particular, Part II of the opinion—the part that discusses the legal principles applicable to grand jury discrimination claims generally—was not joined by five Justices who also joined in the judgment. Cf. *Gregg* v. *Georgia*, 428 U. S. 153, 169, n. 15 (1976) (Court's holding is "that position taken by those Members who concurred in the judgments on the narrowest grounds"). Moreover, the opinion's discussion of general principles was irrelevant to the result, which turned on the insufficiency of the evidence of discrimination. In my view, therefore, *Rose* is little more than an advisory opinion. See *Flast* v. *Cohen*, 392 U. S. 83, 94–95 (1968); Frankfurter, Note on Advisory Opinions, 37 Harv. L. Rev. 1002, 1005–1007 (1924).

of the judicial process." Nevertheless, as the cases cited above show, the Court has required some showing of actual prejudice to the defendant as a prerequisite to reversal, even when the constitutional error directly affects the fairness of the defendant's trial. Compare *Strickland* v. *Washington, supra,* at 687 (requiring prejudice in ineffective assistance of counsel claims), with *Gideon* v. *Wainwright,* 372 U. S. 335, 344–345 (1963) (emphasizing importance of right to counsel to ensure fair trial). Grand jury discrimination is a serious violation of our constitutional order, but so also are the deprivations of rights guaranteed by the Fourth, Fifth, Sixth, and Fourteenth Amendments to which we have applied harmless-error analysis or an analogous prejudice requirement. Moreover, grand jury discrimination occurs *prior* to trial, while the asserted constitutional violations in most of the above-cited cases occurred *during* trial. The Court does not adequately explain why grand jury discrimination affects the "integrity of the judicial process" to a greater extent than the deprivation of equally vital constitutional rights, nor why it is exempt from a prejudice requirement while other constitutional errors are not.

Thirty-one years ago, in a typically prescient opinion, Justice Jackson called for such an explanation. *Cassell* v. *Texas,* 339 U. S. 282, 299 (1950) (Jackson, J., dissenting). None has been forthcoming. *Rose* v. *Mitchell, supra,* at 575 (Stewart, J., concurring in judgment). Since then, as the cases cited above show, the Court has firmly established the principle that error that does not affect the outcome of a prosecution cannot justify reversing an otherwise valid conviction. That proposition—and the decisions of the last two decades that have reinforced it—is flatly inconsistent with the result reached today. The Court's failure to reconcile this conflict itself violates the doctrine of *stare decisis.*

I would dissent from the Court's decision for this reason alone. The reasoning of *Chapman* and its progeny accords with a rational system of justice—one that fully preserves

constitutional rights but recognizes that not every violation undermines the fairness of a given conviction. In this case, the grand jury error did not affect the fairness of respondent's trial or otherwise injure respondent in any cognizable way. *Infra*, at 274–277. I therefore would reverse the Court of Appeals.

## II

Even assuming that now-established harmless-error principles are inapplicable, this case unjustifiably extends the "century of precedent" on which the Court relies. Those decisions do not require reversal of a decades-old conviction on the ground that it was preceded by an indictment issued by a discriminatorily selected grand jury. The purposes of the "automatic reversal" rule require otherwise.

## A

No one questions that race discrimination in grand jury selection violates the Equal Protection Clause of the Fourteenth Amendment. *E. g., Rose* v. *Mitchell,* 443 U. S., at 551; *id.,* at 577–578 (Stewart, J., concurring in judgment); *id.,* at 590–591 (WHITE, J., dissenting). The issue in this case is not whether the State erred, but what should be done about it. The question is whether reversal of respondent's conviction either is compelled by the Constitution or is an appropriate, but not constitutionally required, remedy for racial discrimination in the selection of grand jurors. See *Bush* v. *Lucas,* 462 U. S. 367, 378 (1983); *Davis* v. *Passman,* 442 U. S. 228, 245 (1979); *Bivens* v. *Six Unknown Federal Narcotics Agents,* 403 U. S. 388, 403, 407 (1971) (Harlan, J., concurring in judgment).

The Constitution does not compel the rule of automatic reversal that the Court applies today. In *Hobby* v. *United States,* 468 U. S. 339 (1984), we acknowledged that discriminatory selection of grand jury foremen violated the Constitution, but we concluded that reversing the petitioner's conviction was an inappropriate remedy for the violation since

grand jury foremen play a minor part in federal prosecutions. *Id.*, at 345–346; see also *Oregon* v. *Elstad*, 470 U. S. 298, 305–307 (1985) (suppression of evidence obtained in violation of *Miranda* v. *Arizona*, 384 U. S. 436 (1966), is not constitutionally compelled); *United States* v. *Leon*, 468 U. S. 897, 905–906 (1984) (suppression of evidence obtained in violation of the Fourth Amendment is not constitutionally compelled); *Stone* v. *Powell*, 428 U. S. 465, 489 (1976); see generally Monaghan, Foreword: Constitutional Common Law, 89 Harv. L. Rev. 1 (1975). The rationale of *Hobby* cannot be squared with the claim that discriminatory selection of the body that charged the defendant *compels* reversal of the defendant's conviction. Rather, it is necessary to determine whether reversal of respondent's conviction is an "appropriate remedy" for the exclusion of blacks from grand juries in Kings County, California, in 1962.[5] *Hobby, supra,* at 342; see *Rose* v. *Mitchell, supra,* at 558–559 (weighing costs and benefits of awarding relief to petitioners claiming grand jury discrimination). Cf. Merrill, The Common Law Powers of Federal Courts, 52 U. Chi. L. Rev. 1, 53 (1985) (arguing that judicially created remedies are appropriate only when "necessary in order to preserve a specifically intended federal right"). That determination depends on (i) the utility of the remedy in either correcting any injustice to respondent or deterring unconstitutional conduct by state officials, and (ii) the remedy's costs to society. *United States* v. *Leon, supra,* at 906–907; *Stone* v. *Powell, supra,* at 489.

## B

The scope of the remedy depends in part on the nature and degree of the harm caused by the wrong. The Court perceives two kinds of harm flowing from grand jury discrimination: harm to respondent's interest in not being charged

---

[5] Respondent does not allege that discriminatory selection of grand jurors continued after 1962. Nor is there anything in the record to support such an allegation.

and convicted because of his race, and harm to society's interest in deterring racial discrimination. I consider in turn these asserted interests and the degree to which they are served in this case by the Court's automatic reversal rule.

### (1)

The Court does not contend that the discriminatory selection of the grand jury that indicted respondent calls into question the correctness of the decision to indict. Such a contention could not withstand analysis. Following his indictment for murder, respondent was convicted of that charge in a trial and by a jury whose fairness is not now challenged. The conviction, affirmed on direct appeal in 1965,[6] establishes that the grand jury's decision to indict was indisputably correct. *Rose* v. *Mitchell, supra,* at 575–576 (Stewart, J., concurring in judgment); *Cassell* v. *Texas,* 339 U. S., at 301–302 (Jackson, J., dissenting). Justice Jackson expressed the point best:

> "It hardly lies in the mouth of a defendant whom a fairly chosen trial jury has found guilty beyond reasonable doubt, to say that his indictment is attributable to prejudice. In this case a trial judge heard the prosecution's evidence, ruled it sufficient to warrant a conviction, appellate courts have held the same, and no further question about it is before us. Moreover, a jury admittedly chosen without racial discrimination has heard the prosecution's and defendant's evidence and has held that guilt beyond a reasonable doubt has been proved. That finding, too, has been affirmed on appeal and is not here. Under such circumstances, it is frivolous to contend that any grand jury, however constituted, could have done its

---

[6] The California Supreme Court affirmed respondent's conviction in 1963; on rehearing in 1965, the court reversed respondent's death sentence but again affirmed his conviction. *Ante,* at 256, n. 2. Respondent is presently serving a sentence of life imprisonment.

duty in any way other than to indict." *Cassell* v. *Texas*, *supra*, at 302 (dissenting).

The Court nevertheless decides that discrimination in the selection of the grand jury potentially harmed respondent, because the grand jury is vested with broad discretion in deciding whether to indict and in framing the charges, and because it is impossible to know whether this discretion would have been exercised differently by a properly selected grand jury. *Ante*, at 263. The point appears to be that an all-white grand jury from which blacks are systematically excluded might be influenced by race in determining whether to indict and for what charge. Since the State may not imprison respondent for a crime if one of its elements is his race, the argument goes, his conviction must be set aside.

This reasoning ignores established principles of equal protection jurisprudence. We have consistently declined to find a violation of the Equal Protection Clause absent a finding of intentional discrimination. *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S. 252, 265 (1977); *Washington* v. *Davis*, 426 U. S. 229, 239 (1976). There has been no showing in this case—indeed, respondent does not even allege—that the Kings County grand jury indicted respondent because of his race, or that the grand jury declined to indict white suspects in the face of similarly strong evidence.[7] Nor is it sensible to assume that impermissible dis-

---

[7] Most criminal cases in Kings County were initiated by information rather than indictment. In the decade ending in 1962, Kings County grand juries indicted a total of only four persons, only one of whom was black. *People* v. *Hillery*, 62 Cal. 2d 692, 710, 401 P. 2d 382, 393 (1965), cert. denied, 386 U. S. 938 (1967). In light of these facts, any claim that discriminatory selection of grand jurors was a mechanism for applying different standards to black offenders than to their white counterparts seems altogether fanciful.

Nor is there any *direct* evidence that the grand jury discriminated against respondent because of his race. The only discrimination in this case was directed not at respondent but at the black residents of Kings County, who were barred from serving on grand juries because of their

crimination might have occurred simply because the grand jury had no black members.  This Court has never suggested that the racial composition of a grand jury gives rise to the inference that indictments are racially motivated, any more than it has suggested that a suspect arrested by a policeman of a different race may challenge his subsequent conviction on that basis.[8]  But the Court now holds that relief is justified in part because of the bare potential, unsupported by any evidence, that an all-white grand jury charged respondent because of his race.

This justification does not square with the Court's previous decisions in this area; at the same time, it fails to explain the outcome of this case.  In *Castaneda* v. *Partida*, 430 U. S. 482 (1977), for example, the Court ordered a new trial for a Hispanic petitioner who was indicted by a grand jury half of whose members were Hispanic.  Whatever value such a result might have, it cannot be justified on the ground that the grand jury indicted the petitioner because of his race.  In this case, due to the small number of blacks in Kings County, a random selection system could well have resulted in a grand jury identical to the one that indicted respondent.  A perfectly representative grand jury—one whose composition reflected the county's racial mix—would have contained only one black member.  Neither outcome would have justified an inference that respondent had been charged because of his race.  See *Akins* v. *Texas*, 325 U. S. 398, 403 (1945).

Once the inference of racial bias in the decision to indict is placed to one side, as it must be under our precedents, it is

---

race.  There is nothing in the record to support a finding that the grand jurors themselves discriminated against anyone on the basis of race, or that they otherwise failed to discharge their duties properly.

[8] Instead, as the Court apparently acknowledges, a validly convicted criminal defendant must show that he was "deliberately charged . . . on account of his race" in order to obtain reversal of the conviction.  *Ante*, at 264 (citing *United States* v. *Batchelder*, 442 U. S. 114, 125, and n. 9 (1979)).  Respondent has not even alleged, much less shown, any discrimination directed at him.  See n. 7, *supra*.

impossible to conclude that the discriminatory selection of Kings County's grand jurors caused respondent to suffer any cognizable injury. There may be a theoretical possibility that a different grand jury might have decided not to indict or to indict for a less serious charge. The fact remains, however, that the grand jury's decision to indict was *correct as a matter of law*, given respondent's subsequent, unchallenged conviction. A defendant has no right to a grand jury that errs in his favor. At most, he has an interest in not being bound over for trial in the absence of any evidence of his guilt, see *Costello* v. *United States*, 350 U. S. 359, 364 (1956) (Burton, J., concurring),[9] or based on impermissible factors such as his race, see *Oyler* v. *Boles*, 368 U. S. 448, 456 (1962). There is no allegation that those rights were violated in this case. The Court's decision cannot, therefore, be justified as a means of redressing any wrong to respondent.

### (2)

As respondent suffered no prejudice from the grand jury discrimination that prompted his claim, the Court's remedy must stand or fall on its utility as a deterrent to government officials who seek to exclude particular groups from grand juries, weighed against the cost that the remedy imposes on society. See *United States* v. *Leon*, 468 U. S., at 906–907. The Court properly emphasizes that grand jury discrimination is "a grave constitutional trespass," *ante*, at 262, but it leaps from that observation to the conclusion that *no matter when the claim is raised* the appropriate response is to reverse the conviction of one indicted by a discriminatorily se-

---

[9] I do not intend to suggest that respondent could have obtained judicial review of the sufficiency of the evidence on which his indictment was based. See *United States* v. *Calandra*, 414 U. S. 338, 345 (1974) ("[A]n indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence"). I suggest only that, assuming such an attack were permitted, respondent could show no violation of any personal right in this case.

278

lected body. That conclusion is not, as the Court erroneously suggests, compelled by precedent; equally important, it seriously disserves the public interest.

The cases on which the Court relies involved relatively brief lapses of time between the defendant's trial and the granting of relief. This fact is unsurprising, since the Court only recently determined that claims of grand jury discrimination may be raised in federal habeas corpus proceedings. See *Rose* v. *Mitchell*, 443 U. S. 545 (1979).[10] Prior to 1970, the Court's grand jury discrimination cases arose on direct appeal from conviction. In all of those cases, the time between the defendant's indictment and this Court's decision was six years or less.[11] Before today, the Court has twice

---

[10] In my separate opinion in *Rose* v. *Mitchell*, I took the position that, where a habeas petitioner is given a full opportunity to litigate his grand jury discrimination claim in state court, he should not be permitted to litigate the claim again on federal habeas corpus. 443 U. S., at 579 (POWELL, J., concurring in judgment). I remain convinced that my conclusion was correct. Nor do I believe that in this case *stare decisis* weighs persuasively against reexamining the question whether a defendant should be permitted to relitigate a claim that has no bearing on either his guilt or on the fairness of the trial that convicted him. *Rose* v. *Mitchell*, decided in 1979, is the only case in which this Court has examined the issue, and *Rose*'s authority is questionable. See n. 4, *supra*.

JUSTICE O'CONNOR has some doubt as to whether respondent had a full and fair opportunity to litigate his grand jury discrimination claim in a state court. *Ante*, at 267 (O'CONNOR, J., concurring in judgment). Respondent concedes that he did in fact relitigate that claim in state habeas corpus proceedings, Brief for Respondent 3, and appealed the denial of relief to the California Supreme Court. *Ibid.* In my view, this afforded respondent an entirely adequate opportunity to litigate in state courts both the underlying discrimination claim and the subsidiary claim that Judge Wingrove was a biased adjudicator.

It is unnecessary actually to decide the issue in this case, for I conclude that the judgment should be reversed on two other grounds: the harmlessness of the error, and the inappropriateness of the Court's remedy in cases in which the discrimination claim is raised so long after the claimant's conviction that retrial is difficult if not impossible.

[11] The longest time lapse occurred in *Strauder* v. *West Virginia*, 100 U. S. 303 (1880). In *Strauder*, the defendant was indicted in October 1874; this Court's decision was rendered in March 1880.

granted relief to habeas corpus petitioners alleging grand jury discrimination. Both cases involved delays comparable to the delay reflected in the cases that arose on direct appeal. See *Castaneda* v. *Partida,* 430 U. S. 482 (1977) (decision announced five years after indictment); *Peters* v. *Kiff,* 407 U. S. 493 (1972) (decision announced six years after indictment).

This case raises the open question whether relief should be denied where the discrimination claim is pressed many years after conviction, and where the State can show that the delay prejudiced its ability to retry the defendant.[12]    Respondent first raised his grand jury discrimination claim before a federal court 16 years after his conviction.[13]    It is now almost a quarter-century since respondent was tried for murder and since the discrimination occurred. The Court finds this time lapse irrelevant. In my view, it is critically important, because it both increases the societal cost of the Court's chosen

---

[12] The Court has decided only two cases in which the State might have argued that a long delay in raising a grand jury discrimination claim prejudiced the State's ability to retry the defendant. In both instances, the Court denied relief on other grounds. *Francis* v. *Henderson,* 425 U. S. 536 (1976) (petitioner raised grand jury discrimination claim seven years after conviction; Court denied relief on exhaustion grounds); *Tollett* v. *Henderson,* 411 U. S. 258 (1973) (petitioner raised grand jury claim 21 years after conviction; Court held that claim was foreclosed because petitioner had pleaded guilty pursuant to competent legal advice).

[13] The reason for this delay is irrelevant, unless bad faith on the State's part can be shown. Because respondent suffered no injury from Kings County's discriminatory selection of grand juries, he cannot fairly complain if he is required to raise his claim promptly in order to secure a windfall.

Moreover, respondent does not appear to have been blameless for the long delay. The California Supreme Court finally rejected respondent's grand jury discrimination claim in 1965. Respondent next raised the claim in 1974, when he sought postconviction relief in state court. During the intervening nine years, respondent raised repeated challenges—ultimately successfully—to his death sentence. There is no apparent reason why respondent could not simultaneously have sought postconviction relief on the grand jury discrimination claim, which if successful would require a new trial on guilt.

remedy and lessens any deterrent force the remedy may otherwise have.

In *Rose* v. *Mitchell, supra,* the Court reasoned that the rule of automatic reversal imposes limited costs on society, since the State is able to retry successful petitioners, and since "the State remains free to use all the proof it introduced to obtain the conviction in the first trial." *Id.,* at 558. This is not the case when relief is granted many years after the original conviction. In those circumstances, the State may find itself severely handicapped in its ability to carry its heavy burden of proving guilt beyond a reasonable doubt. Where the original verdict turned on the jury's credibility judgments, long delays effectively eliminate the State's ability to reconstruct its case. Even where credibility is not central, the passage of time may make the right to retry the defendant "a matter of theory only." Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U. Chi. L. Rev. 142, 147 (1970). Witnesses die or move away; physical evidence is lost; memories fade. For these reasons, the Court has noted that " '[t]he greater the lapse of time, the more unlikely it becomes that the state could reprosecute if retrials are held to be necessary.'" *Peyton* v. *Rowe,* 391 U. S. 54, 62 (1968) (citation omitted).[14]

Long delays also dilute the effectiveness of the reversal rule as a deterrent. This case is illustrative. The architect of the discriminatory selection system that led to respondent's claim, Judge Wingrove, died 19 years ago. Respond-

---

[14] Under the Court's approach, one in respondent's position may be wise to wait to raise his discrimination claim until the State could no longer reconvict him due to the death or disappearance of witnesses or the loss of physical evidence. In effect, this strategy could permit a prisoner to commute a legally imposed sentence of life or long duration. This is a risk society should tolerate where the claim goes to the petitioner's guilt or innocence, or even where the claim seeks otherwise to redress a wrong done to the petitioner. But there is no reason to tolerate this risk where, as here, the claimant was fairly convicted and has suffered no prejudice from the asserted constitutional error.

ent does not allege that the discriminatory practices survived Judge Wingrove, nor is there any evidence in the record to support such an allegation. It is hard to believe that Judge Wingrove might have behaved differently had he known that a convicted defendant might be freed 19 years after his death. Yet that is exactly the proposition that must justify the remedy imposed in this case: that people in positions similar to Judge Wingrove's will change their behavior out of the fear of successful habeas petitions long after they have left office or otherwise passed from the scene. The proposition, to say the least, is highly questionable.

These concerns require that a different balance be struck in a case such as this one than in cases in which the grand jury discrimination claim is adjudicated only a short time after the petitioner's conviction. At the very least, the Court should focus directly on the aspect of delay that increases the costliness of its remedy by allowing the State to show that it would be substantially prejudiced in its ability to retry respondent.[15] If this showing were made, respondent's

---

[15] The Court suggests that Rule 9(a) of the Habeas Corpus Rules, together with congressional inaction, "counsels against" considering prejudice to the State's ability to retry respondent in this case. *Ante*, at 265. This suggestion is erroneous. Rule 9 permits the State to defend against both repetitious habeas petitions, see *Woodard* v. *Hutchins*, 464 U. S. 377, 379 (1984) (POWELL, J., joined by BURGER, C. J., and BLACKMUN, REHNQUIST, and O'CONNOR, JJ., concurring), and petitions to which the State cannot adequately respond due to the petitioner's delay in filing, *e. g.*, *Mayola* v. *Alabama*, 623 F. 2d 992, 999–1000 (CA5 1980), cert. denied, 451 U. S. 913 (1981). The Rule does not by its terms foreclose other consideration of the lapse of time between the petitioner's conviction and the filing of the habeas petition. *Honeycutt* v. *Ward*, 612 F. 2d 36, 43 (CA2 1979) (Friendly, J., concurring in judgment), cert. denied, 446 U. S. 985 (1980). More important, it is a rule of habeas corpus procedure applicable to habeas petitions generally, and does not purport to be a rule of substantive law that defines particular substantive claims for relief. Congress' decision not to amend it therefore says nothing about Congress' intent with regard to the remedy applied here. In sum, the question whether the relief respondent seeks is "appropriate" in this case, *Hobby* v. *United States*, 468

petition for relief should be denied. Such an approach would also identify those cases in which granting habeas relief could be expected to have the least deterrent value: the State will likely suffer the greatest prejudice in cases of long delay, and those are the cases in which the automatic reversal rule is least likely to alter the behavior of discriminatory officials. This approach would leave the rule that the Court defends intact in precisely those cases where it does the most good and the least harm: cases in which the responsible officials are likely to be accountable for forcing the State to again prove its case, and in which retrial and reconviction are plausible possibilities.

## III

Twenty-three years ago, respondent was fairly convicted of the most serious of crimes. Respondent's grand jury discrimination claim casts no doubt on the adequacy of the procedures used to convict him or on the sufficiency of the evidence of his guilt. For that reason alone, the Court should reverse the Court of Appeals' decision.[16] Even assuming the

---

U. S. 339, 342 (1984), is governed neither by Rule 9 nor by Congress' decisions not to amend that Rule. See *Stone* v. *Powell*, 428 U. S. 465, 474–482 (1976) (discussing relationship between habeas corpus statute and the rule that evidence seized in violation of the Fourth Amendment is inadmissible). As the Court stated in *Fay* v. *Noia*, 372 U. S. 391, 438 (1963):

"[W]e recognize a limited discretion in the federal judge to deny [habeas corpus] relief to an applicant under certain circumstances. Discretion is implicit in the statutory command that the judge, after granting the writ and holding a hearing of appropriate scope, 'dispose of the matter as law and justice require,' 28 U. S. C. § 2243; and discretion was the flexible concept employed by the federal courts in developing the exhaustion rule. Furthermore, habeas corpus has traditionally been regarded as governed by equitable principles."

See also *Stone* v. *Powell*, *supra*, at 478, n. 11. Those "equitable principles" cannot, in my view, require that the Court apply a remedy that is not constitutionally compelled beyond the bounds of justice and good sense.

[16] Confidence in our system of justice is eroded when one found guilty of murder, in a trial conceded to be fair, is set free. It is important to remember that the criminal law's aim is twofold: "that guilt shall not escape

harmlessness of the error is irrelevant, however, reversal is still required. The Court inappropriately applies a deterrence rule in a context where it is unlikely to deter, and where its costs to society are likely to be especially high. These considerations should at least lead the Court to remand for a determination of whether the long lapse of time since respondent's conviction would prejudice the State's ability to retry respondent.

The Court follows neither of these paths, but instead affirms a decision that will likely mean that respondent must be freed for no good purpose. This result is not compelled by precedent. But if it were, its consequences would justify reconsidering those decisions thought to require it. I therefore dissent.

---

or innocence suffer." *Berger* v. *United States*, 295 U. S. 78, 88 (1935); see also *United States* v. *Agurs*, 427 U. S. 97, 112 (1976). The Court's decision in this case plainly undermines the State's interest in punishing the guilty, without either protecting the innocent or ensuring the fundamental fairness of the procedures pursuant to which one such as respondent is tried and convicted.