**Richard S. DEMAREST, Petitioner,**

v.

**William PRICE, Superintendent of the Arkansas Valley Correctional Facility, and Gale A. Norton, Colorado Attorney General, Respondents.**

**No. 91 N 827.**

United States District Court,
D. Colorado.

Nov. 20, 1995.

Vicki Mandell–King, Assistant Federal Public Defender, Chief, Appellate Division, Denver, CO, for petitioner.

Robert Mark Russell, Assistant Attorney General, Criminal Enforcement Section, Denver, CO, for respondents.

## MEMORANDUM OPINION AND ORDER

NOTTINGHAM, District Judge.

Petitioner Richard S. Demarest, a state prisoner in the custody of the Colorado Department of Corrections, seeks a writ of habeas corpus pursuant to 28 U.S.C.A. § 2254

(West 1994). In October 1981, Demarest was convicted of first degree murder in Jefferson County, Colorado, District Court and sentenced to life imprisonment. Demarest argues, *inter alia*, that he received ineffective assistance of counsel at trial. The matter is now before the court on the "Recommendation of United States Magistrate Judge," filed April 23, 1993, and supplemented August 4, 1995, in which the magistrate judge recommends that the court grant Demarest's petition for habeas relief. I find and conclude that Demarest did not receive effective assistance of counsel at trial, and, on that ground, I grant his petition for writ of habeas corpus. Because my assessment depends upon comparing the actual course of trial events with what likely would have happened had counsel performed competently, a detailed examination of the facts and procedural history of the case in the state courts is necessary.

## FACTS

### 1. The Murder of Ronald H. Hyams

On February 9, 1981, Ronald H. Hyams was brutally murdered at his home in Evergreen, Colorado. (Tr. of Trial at 38 [Prosecution's opening statement], *Colorado v. Demarest*, No. 81 CR 259 [Jefferson County Dist. Ct.] [hereinafter "Tr. of Trial"].) Hyams shared his home with Demarest, a friend of thirteen years, and Carol Lee Held, another close friend. (*Id.* at 203, 246 [Held's Test.].) Calling from a neighbor's house, Demarest reported Hyams' murder to the Jefferson County Sheriff's Department in the early afternoon of February 9, 1981. (*Id.* at 117 [dispatcher's Test.].) In a panicked, sobbing voice, he told the emergency operator that he had discovered Hyams' body and that it looked as though he had been murdered. (People's Ex. 63 [Demarest's call to sheriff's department (Feb. 9, 1981)], *Demarest* [No. 81 CR 259].) After calling the sheriff, Demarest ran back to his house and collapsed under a tree in the front yard, next to the gravel driveway. (Tr. of Trial at 99, 103 [Test. of workman at house the day of Hyams' murder].) Paul McCoy, another neighbor, saw that Demarest was in distress, helped him sit under the tree, and waited with him for emergency personnel. (*Id.* at 103.)

When members of the Jefferson County Sheriff's Department arrived, they found Hyams' body in his downstairs bedroom. (*Id.* at 61 [Deputy Petier's Test.].) Hyams' head was wrapped in a blue bathrobe, and his uncovered neck revealed puncture wounds in the throat and collar bone area. (*Id.* at 166 [Deputy Manwaring's Test.].) After performing an autopsy on Hyams' body, the State's pathologist concluded that Hyams died from "the combined effects of trauma to the head and to [sic] blood loss from the stab wounds in the left neck and from the complication of strangulation of the neck." (*Id.* at 638.)

Demarest suffered an emotional breakdown after Hyams' murder. The neighbor who waited with him for emergency personnel described Demarest as "obviously distraught" and in shock. (*Id.* at 192.) Emergency personnel took Demarest from the house to the Evergreen Medical Center. (*See id.* at 218 [Carol Lee Held's Test.].) Demarest's second roommate, Held, was called to the medical center and found Demarest on a stretcher in an ambulance there. (*Id.*) He was shivering, and his hands were cold. (*Id.*) That night, after he had returned home, Demarest grew unresponsive to Held's attempts to talk with him. (*See id.* at 227.) He fell into a trance, squeezing up his body, and clenching and releasing his hands, according to Held. (*Id.* at 227–28.) Frightened, Held called the sheriff's department for help. (People's Ex. 114 [Held's call to sheriff's department (Feb. 10, 1981)], *Demarest*, [No. 81 CR 259].) The officers responding to Held's call found Demarest lying on the floor in a fetal position, tightening his muscles, and clenching his fists. (Tr. of Trial at 289–90 [patrol sergeant's Test.].) Demarest did not respond to the officers' questions and made only guttural sounds. (*Id.* at 290.) The officers took Demarest back to the Evergreen Medical Center, (*id.* at 231), and, from there, he was transferred to St. Anthony's Hospital and placed in the psychiatric ward, (Evidentiary Hr'g Tr. at 172 [filed Nov. 7, 1994] [Dr. Rehg's Test.]). Police placed Demarest on a seventy-two-hour hold at St. Anthony's in order to enable doctors to detain and treat him as an individual felt to be gravely disabled or a danger to himself or

others. (*Id.* at 173.) At St. Anthony's, Dr. William Rehg diagnosed Demarest with adult situational reaction, a disorder caused by acute stress, and treated him with various prescriptive drugs, (*id.* at 174, 178), some of which have the possible side effect of mental confusion, (*id.* at 104 [toxicologist's Test.]). Dr. Rehg released Demarest on February 11, 1981. (*Id.* at 179.) Demarest returned to his house, joining Held and Hyams' family members and friends who were staying there. (Tr. of Trial at 457 [Hyams' sister's Test.].)

Almost immediately, the Jefferson County Sheriff's Department suspected Demarest as the perpetrator of the grisly slaying. Deputies questioned Demarest three times, once in the ambulance at Evergreen Medical Center the day of the murder (on Demarest's first visit to the medical center), once at the sheriff's office the evening of the murder, and a third time at the sheriff's office on February 12, 1981, after Demarest's release from St. Anthony's Hospital. Throughout the interrogations, Demarest maintained his innocence. (*See* Pet'r's Ex. N [Tr. of Feb. 9, 1981, interrogation], Ex. O [Tr. of Feb. 12, 1981, interrogation].)

During the interrogation on the evening of the murder, Demarest told deputy sheriffs that he had found Hyams' body after going home to look for him. (Pet'r's Ex. N. at 10–11.) Demarest said that he had been to Hyams' dentist to pick him up from an appointment. (*Id.* at 9–10.) Upon learning that Hyams was not there, he had gone home to find him. (*Id.*) Demarest said he had borrowed Hyams' car that morning and wanted to return it in time for Hyams to get to a two o'clock appointment that day with a realtor in Boulder, Colorado. (*See id.* at 8–9.) When the deputies asked why he had scratches on the backs of his hands, Demarest told them that, in a state of profuse grief after discovering Hyams' body, he had pounded his fists into the gravel driveway while waiting for emergency personnel to arrive. (*See id.,* tape 3 at 1.)[1] When asked about scratches on his face, Demarest replied that he had scratched his face at the Ever-

green Medical Center that afternoon. (*See id.,* tape 3 at 1–2.) Deputies also asked Demarest why he had changed shirts the morning of the murder. (*Id.* at 17.) Demarest told them that he changed out of his flannel shirt and into a white shirt because he planned to see a potential business associate later that day and thought the white shirt looked better. (*See id.*)

During the February 12, 1981, interrogation, after repeatedly accusing Demarest of murdering Hyams, Deputy Ford Demming showed Demarest a photograph of Hyams when he was alive. (*See* Pet'r's Ex. O, tape 5 at 25.)[2] Upon seeing the picture, Demarest began shaking, fell onto the floor, and curled into a fetal position. (*Id.,* tape 5 at 26.) He did not respond to Demming's demands that he return to his chair. (*Id.*) Demming summoned emergency medical personnel, (*id.*), and Demarest was returned to St. Anthony's psychiatric ward, (*see* Evidentiary Hr'g Tr. at 184). There, he was diagnosed with "adult situational disorder with withdrawal" by another doctor, Dr. Gary Fletcher. (Pet'r's Ex. A–5.) Dr. Fletcher treated Demarest with prescriptive drugs, and Demarest stayed at St. Anthony's until February 23, 1981. (*Id.*)

On March 18, 1981, the district attorney charged Demarest with Hyams' murder. (R., Vol. A–I at 08 [Information (filed Mar. 18, 1981)], *Demarest* [No. 81 CR 259] [hereinafter "R."].) The state public defender represented Demarest until June 29, 1981, when William A. Cohan, having been retained by Demarest, entered the case as Demarest's defense attorney. (*Id.,* Vol. I at 000034 [Entry of Appearance (filed June 29, 1981)].)

### 2. Prosecution's Case Against Demarest

As the magistrate judge emphasized and respondents acknowledge, the State's case against Demarest was entirely circumstantial. (*See* Recommendation of United States Mag.J. at 5 [filed Apr. 23, 1993]; Supplemental Recommendation at 2 [filed Aug. 4, 1995]; Objections to Mag.'s Recommendation at 3 [filed May 6, 1993]; Tr. of Trial at 41 [Prose-

---

1. Petitioner's Exhibit N is divided into two separately-numbered sections: the first is numbered as "1–20," and the second is numbered as "tape 3, 1–9."

2. Petitioner's Exhibit O is numbered as "tape 5, 1–26."

cution's opening statement].) Prosecutors developed no theory of motive to explain why Demarest would have killed Hyams, his long-time friend. They implied that Demarest may have stolen some of Hyams' jewelry and hidden it in the house where it was later discovered. (*Id.* at 941–42 [Prosecution's closing argument]; *see also id.* at 449–59 [Hyams' sister's Test.].) They also suggested that Demarest, "down on his luck," was jealous of Hyams' successful business and upset because Hyams was moving to Boulder with a girlfriend. (*Id.* at 944; *see also id.* at 445–48 [Hyams' sister's Test].) Prosecutors never argued explicitly, however, that Demarest killed Hyams in order to get his jewelry or out of jealousy or anger. In fact, during its closing argument, the Prosecution acknowledged that it had no motive to offer the jury. (*See id.* at 931–32.) Nor did the State offer evidence of any animosity between Hyams and Demarest. Rather, it relied on scientific evidence to implicate Demarest in his roommate's murder.

Prosecutors argued that on the morning of February 9, 1981, Demarest struck Hyams' head from behind and bludgeoned his face. (*Id.* at 933.) They maintained that Demarest received fingernail scratches on his hands during an ensuing struggle with Hyams. (*See id.* at 933–34.) After ten or fifteen minutes of deliberation, argued the Prosecution, Demarest killed Hyams by strangling him and stabbing his neck. (*Id.*) Prosecutors suggested that Demarest next drove Hyams' car to the dentist's office and, so as to establish an alibi, acted as if he had come to meet Hyams. (*Id.* at 936.) Upon returning to the house, they argued, Demarest went inside, waited a few minutes (enough time to have discovered the body), and then ran from the house, feigning horror and grief, to telephone for help from a neighbor's house. (*Id.* at 937–38.) Because the neighbor was nearly deaf, Demarest told her what had happened by writing on a note pad "Killed Roo" or "Killed Ron." (*Id.* at 938.) Prosecutors suggested that, overwhelmed with guilt, Demarest was telling the neighbor

that he had killed his roommate or had killed Ron. (*Id.*) [3]

The State's forensic and scientific evidence primarily revealed the manner in which Hyams was killed rather than who his killer was. Nevertheless, the prosecutors used the scientific evidence to implicate Demarest as the killer. The prosecutors relied heavily on a blood spatter analysis done by Dick Hopkins, a detective employed by the Arapahoe County Sheriff's Department. Having qualified Detective Hopkins as an expert in preparing such an analysis, the prosecutors used the blood spatter analysis and the manner of the murder to suggest that Hyams was murdered by a tall, strong, right-handed man. (*Id.* at 682, 692, 696.) Although the jury never learned whether Demarest was right or left-handed, they could see, while he was seated at the defense table, that he was a tall, large man and infer that he was also strong. Detective Hopkins further testified that the scratches on Demarest's hands appeared to have come from fingernails, *i.e.*, during a struggle with Hyams. (*Id.* at 696.) The State's hair and fiber expert testified, however, that scrapings from Hyams' fingernails revealed facial hair which could not have come from Demarest. (*Id.* at 408–09.) Additionally, a blood expert testified that there was no evidence of any blood transferred between Hyams and Demarest. (*Id.* at 381–401.)

The State also used the scientific evidence to support its charge that Demarest was guilty of first degree murder, as opposed to some less serious form of homicide. (*See id.* at 933.) According to Detective Hopkins, the blood staining indicated that there had been an interval of time, approximately ten to fifteen minutes, between the bludgeoning of Hyams' head and the attempted strangulation and final stabbing. (*Id.* at 687.) The Prosecution used this evidence in its closing argument to emphasize that Hyams' killer had plenty of time to deliberate and reflect on what he was doing. (*Id.* at 933.)

---

3. Because the handwriting is unclear, it is difficult to tell what the second word on the note was. (*See* People's Ex. 64, Demarest [No. 81 CR 259].) Respondents speculate that Demarest meant "Killed Roo[mmate]" or "Killed Ron." (Objections to Mag.'s Recommendation at 6–7 [filed May 6, 1993].)

According to the State, a damp washcloth found in Hyams' shower, containing what appeared to be traces of blood, indicated that Demarest had showered after the murder. (*Id.* at 940.) The Prosecution suggested that an intruder would not have showered after killing Hyams. (*Id.*) The State further suggested that Demarest had changed his shirt after the murder because it was covered with blood. (*Id.*) The State's forensic serologist, however, found no traces of Hyams' blood on Demarest's clothing, (*id.* at 381–86), and the washer and dryer at the house did not appear to have been used that day, (*id.* at 326).

Among the witnesses the State called at trial regarding the scratches on Demarest's hands were Abel Manzanares, a workman who was at the house at the time Demarest maintains he discovered Hyams' body, (*id.* at 95–116), Mark Davidson, a volunteer fireman who had spoken with Demarest while he was under the tree in front of his house, (*id.* at 153–62), Paul McCoy, the neighbor who had waited with Demarest for emergency personnel, (*id.* at 188–203), Carol Lee Held, Hyams' and Demarest's roommate, (*id.* at 203–84), and Eileen Bausch, a receptionist at the dentist's office where Demarest claimed he was supposed to meet Hyams before he went home and discovered Hyams' body, (*id.* at 596–609).

Manzanares, the first witness to testify regarding Demarest's hands, stated that he was looking at Demarest "all the time," while waiting for emergency personnel and never saw him pound his fists into the gravel. (*Id.* at 105.) By contrast, McCoy testified that Manzanares' attention was not focused on Demarest. (*Id.* at 196–97.) McCoy stated, however, that he did not see Demarest hit his hands on the gravel. (*Id.* at 202.)

Davidson testified that he did not notice Demarest pounding his fists into the gravel driveway and would have remembered seeing it. (*Id.* at 159.) Before he finished his statement regarding Demarest's hands, however, the prosecutor interrupted him and did not allow him to complete his thought. (*Id.*) Demarest's counsel did not pursue the issue or ask Davidson anything about Demarest's hands during cross-examination.

Held testified that, when she met Demarest in the ambulance at the Evergreen Medi- cal Center, she noticed that his right hand was swollen and that there was a small amount of blood in his cuticles. (*Id.* at 250– 51.) She stated that Demarest frequently "pick[ed] at himself" and that she often saw blood in his cuticles. (*Id.* at 251.) Held also testified that, at the medical center, Demarest told her that he had scratched his hands hitting rocks. (*Id.* at 219–20.)

Bausch, the last witness to testify concerning Demarest's hands, stated that she did not see Demarest's hands when he came into the dental office asking for Hyams. (*Id.* at 599.) Prosecutors used all of this testimony—together with Detective Hopkins' statements— to argue that the cuts on Demarest's hands came from a struggle with Hyams, not from pounding his fists into the gravel, and to suggest that Demarest, who had already committed the murder when he appeared at the dentist's office to establish an alibi, was concealing his scratched hands from Bausch. (*See id.* at 942–43.)

The State also attacked Demarest's credibility by pointing out slight inconsistencies between two of Demarest's statements to the deputy sheriffs interrogating him. (Tr. of Trial at 939–40.) These inconsistencies, however, related only to where Demarest drove after leaving the dentist's office the day of Hyams' murder and whether he knew the identity of Hyams' realtor. (*See id.*)

### 3. Demarest's Trial Counsel—William A. Cohan

When Cohan took Demarest's case, he had never tried a murder case or even a lesser felony case in state court. (R., Vol. II at 000221 [Aff. of Trial Counsel (signed Jan. 6, 1983) ].) He had tried only four or five criminal "tax protest" cases in federal court. (Tr. of rule 35(c) proceedings at 8, 33 [Cohan's Test.] [Dec. 2, 1985], *Demarest* [No. 81 CR 259] [hereinafter "rule 35(c) Hr'g Tr."].) He defended clients accused of willfully failing to file tax returns or supplying fraudulent withholding exemption certificates, (*id.* at 33), misdemeanors involving relatively simple issues. Aside from observing a few motion arguments while interning in a federal public defenders' office during law school, Cohan had no experience in defending a person accused of a felony, let alone murder. (*See*

*id.* at 32.) He did not hire a co-counsel to advise him in handling the case. (*Id.* at 8.) As a result of his inexperience and lack of assistance, Cohan committed numerous errors during his representation of Demarest. I first focus on the most salient—his failure to investigate Demarest's case.

Cohan hired a radio disc jockey with *no* experience in criminal investigation to serve as his only investigator. (*Id.* at 9.) Cohan and the disc jockey developed a theory that a woman whom Hyams had rejected as a business partner, Margery Sheppard, murdered Hyams. (*Id.* at 10.) They pursued no other defense theories. (*See id.* at 36.) Neither Cohan nor the disc jockey investigated the Prosecution's case against Demarest. (*See id.* at 35–36.) They did not interview the Prosecution's expert witnesses; nor did they consider consulting experts of their own. (*See id.* at 27.) They did not listen to the tapes of Demarest's interrogations. (*See id.*) They never considered obtaining Demarest's records from St. Anthony's. (*See id.* at 16.)

The magistrate judge also discussed Cohan's failure to interview witnesses associated with the State's case. (*See* Recommendation of United States Mag.J. at 33.) Although the record does not clearly indicate that Cohan interviewed none of the State's witnesses, two witnesses (Bausch and Davidson) testified at the magistrate judge's evidentiary hearing that Cohan did not interview them. (Evidentiary Hr'g Tr. at 151–52, 156–57, 162–64.) Given Bausch and Davidson's testimony, Cohan's acknowledgment that he and the disc jockey spent the majority of their time investigating the Sheppard theory, and the absence of evidence that Cohan met with any of the State's witnesses prior to trial, I agree with the magistrate judge's inference that none of the witnesses was interviewed.

Cohan's trial strategy was to call Sheppard as a witness and, while she was on the witness stand, either accuse her of the murder or insinuate that she had murdered Hyams. (*Id.* at 10.) After somehow learning of Cohan's intention, Sheppard informed the judge, mid-trial, that she planned to invoke her fifth amendment right against self-incrimination if Cohan called her as a witness. (Tr. of Trial at 337.) In accordance with Colorado law, the trial judge refused to permit Cohan to call Sheppard to the witness stand. (*Id.* at 346–47.) *See People v. Fletcher*, 193 Colo. 314, 566 P.2d 345, 347 (1977) (" 'the defense may not ask a defense witness questions which it knows the witness will refuse to answer because of a valid claim to a privilege not to testify' ") (quoting *People v. Dikeman*, 192 Colo. 1, 555 P.2d 519 [1976] ). Cohan had no evidence linking Sheppard to Hyams' murder apart from what he hoped would be her self-incriminating testimony. (Rule 35[c] Hr'g Tr. at 10.) Consequently, Demarest was left with no theory of defense at trial.

In a last-minute attempt to salvage the case, Cohan speculated during his closing argument that someone other than Demarest, possibly a person involved in drugs or a spurned woman, had murdered Hyams. (*See* Tr. of Trial at 945–74.) Because he had conducted no investigation outside of the Sheppard theory, however, Cohan had no evidence to bolster this assertion. As a result, his closing argument was unfocused, offensive to jurors as well as the court, and wholly ineffective. Cohan addressed a juror by name twice, including once after the court admonished him not to address jurors by name; he called on jurors to speculate; and he drew several sustained objections. (*See id.*)

The narrow focus of Cohan's preparation affected his handling of the State's scientific evidence. He could not effectively attack the conclusions which the State drew from this scientific evidence concerning the manner in which Hyams was killed (particularly the blood spatter analysis and the scratches on Demarest's hands) because he and the disc jockey had only investigated the Sheppard theory. They had not interviewed the State's pathologist or its blood spatter expert before trial. (Rule 35[c] Hr'g Tr. at 27.) Nor had they consulted any experts of their own concerning the probative value of the Prosecution's scientific evidence. (*Id.*) [4]

4. I recognize that an attempt by a defense investigator or counsel to interview a detective may be problematic, even where the detective is expected to be qualified as an expert witness. This circumstance makes it even more critical for the defense to have its own expert to consult in preparation for cross-examination.

At an evidentiary hearing conducted by the United States magistrate judge, two of the State's witnesses, Bausch and Davidson, testified that, had Cohan interviewed them prior to trial, they would testified more clearly about what they remembered concerning the presence of scratches on Demarest's hands. (Evidentiary Hr'g Tr. at 151–52; 156–57, 162–64.) Bausch testified that she had been nervous at trial and not testified clearly because she "wanted out of there and just kind of rolled with it ... even though [she] knew what was going on was not correct." (*Id.* at 149–50.) She said that she recalled seeing Demarest's hands and face but did not remember seeing any scratches on either. (*Id.* at 139.) Bausch stated that, if Cohan would have interviewed her before trial, she would have testified that she did not see any scratches on Demarest's hands or face and that she would have remembered such scratches. (*Id.* at 140, 151–52.) Davidson testified that he saw Demarest pound the heels of his hands into the gravel driveway while sitting under the tree in his front yard, and that, had Cohan interviewed him prior to the trial, he would have testified at trial that he remembered Demarest pounding his hands into the gravel. (*Id.* at 156–57, 162–64.)

Similarly, Cohan and the disc jockey never contacted any of the psychiatrists who treated Demarest at St. Anthony's in the days following Hyams' murder or subpoenaed Demarest's records from the hospital. (*See id.* at 18.) Consequently, Cohan never learned about the side effects of the various medications Demarest was taking at the time of the interrogations, *i.e.*, impaired mental ability, mental confusion, and decreased alertness. (*See* Evidentiary Hr'g Tr. at 95–134 [toxicologist's Test.].) Had he possessed this information, Cohan would have been able to substantiate his argument to the trial judge that Demarest's statements to the deputy sheriffs should be suppressed as involuntary. (*See* rule 35[c] Hr'g Tr. at 17 [Cohan's Test.].) Even if he had lost the suppression argument, Cohan could have argued to the jury (1) that the statements were involuntary and/or (2) that inconsistencies upon which the Prosecution relied to call into question Demarest's credibility were the product of a confused mental state. Moreover, by failing to contact persons who could provide the jury with a medical explanation for Demarest's breakdown, Cohan left unrebutted the Prosecution's suggestion that Demarest collapsed out of guilt over killing his friend on the night of the murder and upon seeing Hyams' picture at the sheriff's office. (*See* Tr. of Trial at 942 [Prosecution's Closing Argument].)

## PROCEDURAL HISTORY

### 1. Conviction

On October 27, 1981, Demarest was convicted of the first-degree murder of Ronald H. Hyams. (R., Vol. I at 000185 [Judgment of Conviction: Sentence: and Order to Sheriff (Mittimus) ] [filed Dec. 7, 1981].) He was sentenced to life imprisonment on December 7, 1981. (*Id.*) Since his incarceration, Demarest has received only one disciplinary write-up—for failing to produce a urine sample within an hour, in a circumstance where he was unable to comply due to a medical condition. (Mot. for Release on Bond Pending Resolution of Habeas Corpus Action at 4 [filed May 5, 1993].) Additionally, Demarest has successfully completed several education programs while in prison, many in legal studies. (*Id.*)

### 2. Direct Appeal

Demarest appealed his conviction to the Colorado Court of Appeals on December 22, 1981. (R., Vol. II at 000189 [Notice of Appeal (filed Dec. 22, 1981) ].) The Colorado Court of Appeals affirmed Demarest's conviction on May 24, 1984. (*Colorado v. Demarest*, No. 82 CA 122 [Colorado Ct.App. May 24, 1984].) The appellate court noted that Cohan had failed to preserve the allegations of error asserted on appeal. (*Id.* at 1.) The Colorado Supreme Court denied certiorari on December 10, 1984. (*Colorado v. Demarest*, No. 84 SC 295 [Colo. Dec. 10, 1984].)

### 3. State Collateral Review

On June 12, 1985, Demarest moved for post-conviction relief pursuant to rule 35(c) of the Colorado Rules of Criminal Procedure in Jefferson County District Court. (R., Vol. II at 000216–17 [Mot. for Post Conviction Relief Pursuant to rule 35(c)(2), (3) (filed June 12,

1985)].) In his motion, Demarest argued that he received ineffective assistance of counsel at trial. (*Id.* at 1.) The state judge who had presided over Demarest's trial held an evidentiary hearing on December 2, 1985, at which Cohan, Demarest, and a legal expert, Charles Hoppin, testified. (Rule 35[c] Hr'g Tr.). Cohan acknowledged that he had committed numerous errors at trial, including: (1) failing to hire co-counsel, (*id.* at 8); (2) limiting his investigation to the Sheppard theory, (*see id.* at 10); (3) failing to research the voluntariness of Demarest's statements under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), (*id.* at 11); (4) failing to contact the physicians at St. Anthony's who treated Demarest after Hyams' murder or subpoena Demarest's records from St. Anthony's, (*id.* at 16–17); (5) failing to contact the neighbor who waited under the tree with Demarest for emergency personnel, (*id.* at 19); (6) failing to make an appellate record, (*id.* at 20); (7) frightening jurors by allowing personal troubles to cause him to become overly frustrated during cross-examination of the Prosecution's blood-spatter expert, (*id.* at 23–24); (8) citing overruled case law in argument to the court, (*id.* at 29); and (9) failing to familiarize himself with Colorado rules of appellate procedure, (*id.*).

On January 24, 1986, the state trial judge, in a written order, denied Demarest's motion for post-conviction relief. (*See* R., Vol. II at 000272–78 [Findings, Conclusions, and Orders (filed Jan. 24, 1986)].) Demarest appealed to the Colorado Court of Appeals on March 5, 1986. (*Id.* at 000282 [Notice of Appeal (filed Mar. 5, 1986)].) The appellate court affirmed the denial of the rule 35(c) motion on April 7, 1988. (*Id.* at 000302 [Unpublished Opinion (filed Apr. 7, 1988)].) The Colorado Supreme Court denied certiorari on December 19, 1988. (*Id.* at 000301 [Order of Court (filed Dec. 19, 1988)].)

On February 22, 1989, Demarest filed a second motion for post-conviction relief pursuant to rule 35(c) in Jefferson County District Court in which he asserted that: (1) he was denied a constitutionally adequate competency hearing prior to trial; (2) exculpatory evidence which should have been presented to the jury was unconstitutionally excluded; (3) he was unconstitutionally denied the benefit of new law during the direct appeal of his conviction; (4) the Colorado Court of Appeals unconstitutionally rendered its opinion without the record before it; (5) appellate court cases decided during his direct appeal merited retrying him; and (6) the Prosecution unconstitutionally introduced prejudicial evidence in the presence of the jury. (*Id.* at 000308–09 [Motion for Postconviction Relief Pursuant to Crim.P. 35(c) (filed Feb. 22, 1989)].) A different judge, who had not been theretofore connected with the proceedings, denied Demarest's second motion for post-conviction relief on March 8, 1989. (*Id.* at 000354–56 [Order (filed Mar. 8, 1989)].) Demarest appealed on March 27, 1989. (*Id.* at 000360 [Notice of Appeal (filed Mar. 27, 1989)].) The Colorado Court of Appeals affirmed the lower court's ruling on May 3, 1990. (*Colorado v. Demarest,* No. 89 CA 447 [Colo.Ct.App. May 3, 1990].) The Colorado Supreme Court denied certiorari on November 19, 1990. (*Colorado v. Demarest,* No. 90 SC 439 [Colo. Nov. 19, 1990].) Chief Justice Rovira dissented, stating that he would have granted certiorari as to "whether the court of appeals erred in issuing an opinion without the complete record before it," and "whether the court of appeals erred in issuing an opinion in the absence of any legal argument submitted by the parties." (*Id.*)

### 4. Petition for Writ of Habeas Corpus

On May 16, 1991, Demarest petitioned the United States District Court for the District of Colorado for a writ of habeas corpus pursuant to 28 U.S.C.A. § 2254. Demarest alleged that: (1) he received ineffective assistance of counsel at trial, in violation of the Sixth and Fourteenth Amendments; (2) the Colorado Court of Appeals relied on matters which were not part of the official record in deciding his case, in violation of the Fifth and Fourteenth Amendments; (3) the trial judge failed to hold an adequate hearing regarding Demarest's competency to stand trial, in violation of the Fifth and Fourteenth Amendments; (4) the Colorado Court of Appeals reviewed his denial of post-conviction relief without the complete record before it and in the absence of argument or briefing by the parties, in violation of the Fifth and Fourteenth Amendments; (5) the trial court refused to consider the voluntariness of his

statements to deputy sheriffs, in violation of the Fifth, Sixth, and Fourteenth Amendments; and (6) the Colorado Court of Appeals failed to remand his case in light of a new ruling, in violation of the Fifth, Sixth, and Fourteenth Amendments. (Pet. at 6–14.) Because I conclude that Demarest received ineffective assistance of counsel at trial, I do not reach his other arguments.

### 5. Magistrate Judge's Recommendation

In accordance with rule 72.4 of the United States District Court for the District of Colorado Local Rules of Practice, Demarest's petition was referred to a United States magistrate judge for review and recommendation. D.Colo.R. 72.4. After reviewing Demarest's petition, the record of state court proceedings, and the briefs filed in conjunction with Demarest's efforts for post-conviction relief, Magistrate Judge O. Edward Schlatter recommended that Demarest be granted a writ of habeas corpus. (Recommendation of United States Mag.J. at 2 [filed Apr. 23, 1993].) The magistrate judge determined that Demarest had demonstrated denial of his right to effective assistance of counsel, in violation of the Sixth Amendment. (Id.) He did not address the other grounds on which Demarest petitioned, concluding that they were either not well-founded, did not constitute sufficient bases for habeas corpus, or were matters which might be raised at a new trial. (Id.)

The magistrate judge determined that Cohan rendered ineffective assistance of counsel, as defined by *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), in failing to: (1) hire an experienced co-counsel; (2) hire an experienced criminal investigator; (3) investigate the Prosecution's case against Demarest or investigate defense theories other than the Sheppard theory; (4) interview the State's experts; (5) hire experts on Demarest's behalf; (6) investigate Demarest's alibi; (7) offer jury instructions on Demarest's alibi; and (8) preserve objections for appeal. (Id. at 11–14.) After reviewing the magistrate judge's recommendation, United States District Judge Jim R. Carrigan remanded the case for further pro-

ceedings regarding the issue of whether Demarest was prejudiced by Cohan's acts or omissions.[5] (Order at 4 [filed June 30, 1993].)

On remand, the magistrate judge conducted an evidentiary hearing to determine whether Cohan prejudiced Demarest's case, *i.e.*, whether, but for Cohan's errors, there was a reasonable possibility that the outcome of Demarest's case would have been different. (*See* Evidentiary Hr'g Tr., Vol. I–III [filed Nov. 7, 1994].) At the hearing, held on October 17, 18, and 20, 1994, Demarest called several witnesses.

Dr. Richard Cohen, a colo-rectal surgeon, testified that he had performed hemorrhoid surgery on Demarest shortly before the trial and prescribed narcotics and tranquilizers for him. (*Id.*, Vol. I at 5–26.) Demarest's cellmate before the trial, Dennis Germany, testified that Demarest was in severe pain due to the hemorrhoids and took a great deal of medication. (*Id.* at 26–41.) Dr. Donald Kennedy, a fluid-dynamics expert, testified that there was no scientific basis for the conclusions drawn at trial by the Prosecution's blood-spatter expert, Detective Hopkins. (*Id.* at 41–95.) Toxicologist Dr. Kathy Vedeal testified that the prescription drugs Demarest was taking at the time of trial could have caused impaired mental ability, mental confusion, and decreased alertness. (*Id.* at 95–134.)

Eileen Bausch, the dentist's office receptionist, testified that during her previous testimony, she was frightened and nervous, and her memory of Demarest's hands was "cloudy." (*Id.* at 147.) Bausch stated that she must have seen Demarest's hands when he was in the office and that, probably because she misunderstood the prosecutor's question, she testified incorrectly at trial. (*Id.* at 147–48.) Bausch testified that, had Cohan contacted her prior to the trial, she would have stated clearly that there were no scratches on Demarest's hands or face at the time he was in the dentist's office. (*Id.* at 151–52.) Mark Davidson, the volunteer fireman who talked with Demarest while he was under the

---

5. Demarest's petition was transferred to me from Judge Carrigan on September 20, 1995, upon the

occasion of Judge Carrigan's retirement.

tree on the day of the murder, testified at the evidentiary hearing that he remembered Demarest pounding his fists. (*Id.* at 154–64.) He stated that if Cohan or another representative of Demarest's defense team had contacted him prior to trial, he would have testified at trial that he remembered seeing Demarest pounding his hands into the gravel driveway. (*Id.* at 162–63.)

One of the St. Anthony's psychiatrists who treated Demarest in the days following Hyams' murder, Dr. William Rehg, testified that he diagnosed Demarest with adult situational reaction syndrome in response to severe, acute stress, and treated him with several medications. (*Id.*, Vol. II at 174–78.) He also testified that finding Hyams' body and undergoing interrogation each could have caused Demarest's breakdown. (*See id.* at 176.) Dr. Rehg testified that, had he known Demarest was going to be interrogated upon leaving St. Anthony's, he would not have released him. (*Id.* at 183.) Dr. Rehg stated that Demarest probably relapsed when he fell onto the floor and curled into a fetal position during the deputy sheriffs' interrogation. (*Id.* at 184.)

Demarest's last witness at the evidentiary hearing was Lee Foreman, a legal expert. Foreman testified that Cohan was not prepared to try Demarest's case and committed the following errors: (1) going to trial without having talked to witnesses; (2) attempting to present a single defense theory which was impossible under then-existing case law; (3) making no effort to present Demarest's psychiatric and medical history to the trial judge; (4) presenting no evidence to support his argument that Demarest involuntarily waived his *Miranda* rights; and (5) failing to challenge the blood-spatter expert's testimony to matters outside his realm of expertise. (*Id.* at 201–03.) In Foreman's opinion, Cohan's failure to investigate and interview witnesses prior to trial alone prejudiced Demarest within the meaning of *Strickland*. (*Id.* at 217.) *See Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066 (1984) ("counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"). Foreman concluded that Cohan's mistakes resulted in the admission of irrelevant evidence or evidence which might have been suppressed, and, had

the mistakes not occurred, the result of Demarest's trial probably would have been different. (Evidentiary Hr'g Tr., Vol. II at 226.)

At the evidentiary hearing, the State called Fred Demming, one of the sheriff's deputies who interrogated Demarest, and Terrence Gillespie, one of the prosecutors at Demarest's trial. According to Demming, Demarest was not under the influence of drugs during the interrogations. (*Id.*, Vol. III at 269.) Gillespie testified that he did not believe that Demarest's mental abilities were impaired during the trial. (*Id.* at 288.)

After considering the testimony offered at the evidentiary hearing and reviewing the state court proceedings and parties' arguments, the magistrate judge concluded that Demarest was prejudiced by Cohan's inadequate and ineffective defense. (Supplemental Recommendation at 2.) The magistrate judge explained, "Mr. Cohan's failure to interview witnesses, and to obtain experts resulted in a trial record that does not reflect an accurate representation of all of the facts which were available to petitioner." (*Id.* at 28.) He summarized Cohan's mistakes and their effect on Demarest's trial as follows:

> Because of the ineffective assistance of counsel which he received from Mr. Cohan, petitioner did not receive a fair trial. I find that petitioner was prejudiced by Mr. Cohan's errors and omissions.... Viewing the totality of the circumstances, and viewing the cumulative effect of the errors and omissions of Mr. Cohan as listed in this section, there is "a substantial probability that correction of constitutional error at retrial will effect a different result." [*Henderson v. Sargent*, 926 F.2d 706, 711 (8th Cir.1991), *cert. denied*, 502 U.S. 1050, 112 S.Ct. 915, 116 L.Ed.2d 815 (1992).]

(*Id.* at 41.)

## ANALYSIS

### 1. Standard of Review

Pursuant to 28 U.S.C.A. § 2241(c)(3) (West 1994), I review Demarest's conviction to determine whether he is being held by the state of Colorado in violation of the United States Constitution. Because Respondents have ob-

jected to the magistrate judge's recommendation that Demarest be granted habeas relief on the ground that he was denied effective assistance of counsel, (*see* Objections to Mag.J.'s Recommendation, Objection to Mag. J.'s Supplemental Recommendation [filed Sept. 14, 1995] ), I review the magistrate judge's recommendation *de novo* pursuant to 28 U.S.C.A. § 636(b)(1) (West 1993).

### 2. *Exhaustion of State Remedies*

■ Before bringing a habeas corpus petition in federal court, a state prisoner must exhaust all available state remedies. 28 U.S.C.A. § 2254(b). Exhaustion of state remedies is completed only when the question presented to the federal court cannot be raised under any available state procedure. 28 U.S.C.A. § 2254(c). In his first motion for post-conviction relief under rule 35(c) of the Colorado Rules of Criminal Procedure, Demarest argued, *inter alia*, that Cohan's failure to investigate his case constituted ineffective assistance of counsel. (*See* R., Vol. II at 000216 [Mot. for Post Conviction Relief Pursuant to rule 35(c)(2), (3) ].) After the trial court denied his motion, Demarest appealed to the Colorado Court of Appeals and the Colorado Supreme Court. (*Id.* at 000302 [Unpublished Opinion (filed Apr. 7, 1988) ], 000301 [Order of Court (filed Dec. 19, 1988) ].) Thus, I find that Demarest exhausted all available state remedies with respect to his claim that Cohan rendered ineffective assistance of counsel by failing to investigate the case. The analysis does not end here, however, because respondents argue that Demarest did not exhaust his state remedies with respect to the component of his ineffective assistance claim regarding Cohan's failure to interview Bausch and Davidson. (Objection to Mag.J.'s Supplemental Recommendation at 13–16.) Because that aspect of the claim is unexhausted, respondents maintain, the court is precluded from considering the testimony Bausch and Davidson gave at the magistrate judge's evidentiary hearing. (*Id.*) The magistrate judge did not address this issue.

As mentioned above, in his initial post-conviction petition under rule 35(c) of the Colorado Rules of Criminal Procedure, Demarest argued that Cohan failed to investigate his case. (R., Vol. II at 000216 [Mot. for Post Conviction Relief Pursuant to rule 35(c)(2), (3) ].) At the rule 35(c) hearing, Demarest presented evidence supporting his claim, primarily through the testimony of Cohan himself. Among the examples Cohan gave of his failure to investigate Demarest's case was his failure to interview: (1) Detective Hopkins, the blood spatter expert, (2) the State's pathologist, (3) any of the doctors who treated Demarest at St. Anthony's, (4) the driver of the ambulance which took Demarest to the Evergreen Medical Center the afternoon of Hyams' murder, or (5) Paul McCoy, the neighbor who had sat with Demarest while they waited for emergency personnel to arrive. (Rule 35[c] Hr'g Tr. at 17–19, 27.) Cohan did not testify at the state hearing, however, that he failed to interview Bausch or Davidson before the trial.

■ A "habeas petitioner must have 'fairly presented' to the state courts the 'substance' of his federal habeas claim." *Anderson v. Harless*, 459 U.S. 4, 6, 103 S.Ct. 276, 277, 74 L.Ed.2d 3 (1982) (quoting *Picard v. Connor*, 404 U.S. 270, 275, 277–78, 92 S.Ct. 509, 512, 513–14, 30 L.Ed.2d 438 [1971] ). This allows state courts to "have the first opportunity to hear the claim sought to be vindicated by the federal habeas petitioner." *Nichols v. Sullivan*, 867 F.2d 1250, 1252 (10th Cir.), *cert. denied*, 490 U.S. 1112, 109 S.Ct. 3169, 104 L.Ed.2d 1031 (1989). In other words, the purpose of the "fairly presented" requirement is "to alert fairly the state court to the federal nature of the claim and to permit that court to adjudicate squarely that federal issue." *Verdin v. O'Leary*, 972 F.2d 1467, 1474 (7th Cir.1992). A habeas petitioner may, however, introduce new evidence to support a previously asserted claim where that evidence does not transform the claim into a fundamentally new argument or put the claim in a significantly different and stronger posture than when the state courts considered it. *Nichols*, 867 F.2d at 1252–53; *Jones v. Hess*, 681 F.2d 688, 694 (10th Cir. 1982); *see also Caballero v. Keane*, 42 F.3d 738, 741 (2d Cir.1994) (dismissal for failure to exhaust state remedies not required where evidence presented for the first time in federal court merely supplements and does not fundamentally alter the claim presented to the state courts); *Chacon v. Wood*, 36 F.3d 1459, 1468 (9th Cir.1994) ("new factual alle-

gations do not render a claim unexhausted unless they 'fundamentally alter the legal claim already considered by the state courts'") (quoting *Vasquez v. Hillery*, 474 U.S. 254, 260, 106 S.Ct. 617, 621, 88 L.Ed.2d 598 [1986] ); *Kenley v. Armontrout*, 937 F.2d 1298, 1302–03 (8th Cir.), *cert. denied*, 502 U.S. 964, 112 S.Ct. 431, 116 L.Ed.2d 450 (1991) ("federal claim should not present significant additional facts such that the claim was not fairly presented to the state court"; claims made in state and federal courts must have "at least an 'arguable factual commonality' ") (citations omitted). The federal court must avoid hypertechnicality in considering whether a habeas petitioner has satisfied the exhaustion requirement. *Williams v. Washington*, 59 F.3d 673, 677 (7th Cir.1995) (citing *Verdin*, 972 F.2d at 1474).

■ Here, Demarest presented to the Colorado state courts his claim that Cohan's failure to investigate constituted ineffective assistance of counsel and supported the claim with evidence that Cohan neglected to interview several important witnesses. Cohan's failure to interview Bausch and Davidson, although not specifically presented to the state courts, is supplementary evidence of Cohan's failure to investigate, manifested in part by his failure to interview witnesses. The testimony Bausch and Davidson gave at the evidentiary hearing does not alter the nature of Demarest's claim, nor does it significantly bolster the claim so as to substantially influence the ultimate determination of Demarest's petition for writ of habeas corpus.

The introduction of the additional testimony is similar to the circumstances presented in *Vasquez*. There, the Supreme Court found that the introduction of additional evidence supporting a habeas petitioner's claim which the district court, acting within its discretion, had requested did not fundamentally alter the nature of the claim considered by the state courts. *Vasquez*, 474 U.S. at 260, 106 S.Ct. at 621–22. Likewise here, the magistrate judge acted within his discretion in allowing additional testimony at the evidentiary hearing. *Townsend v. Sain*, 372 U.S. 293, 318, 83 S.Ct. 745, 759, 9 L.Ed.2d 770 (1963), *overruled on other grounds by Keeney v. Tamayo–Reyes*, 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992) (cause and

prejudice standard rather than deliberate bypass standard applies to prisoner's failure to develop a material fact in state court proceedings). Justice O'Connor emphasized in her dissent to *Keeney* that district courts "still possess the discretion, which has not been removed by today's opinion, to hold hearings even where they are not mandatory." *Keeney*, 504 U.S. at 23, 112 S.Ct. at 1727 (O'Connor, J., dissenting); *see also Pagan v. Keane*, 984 F.2d 61, 64 (2d Cir.1993) (federal district courts retain power to hold evidentiary hearings in habeas cases even where they are not required). As explained above, Bausch and Davidson's testimony does not significantly change the nature of Demarest's allegations. Accordingly, I find that Demarest exhausted his state remedies with regard to his allegation that Cohan's failure to interview Bausch and Davidson is an example of Cohan's larger failure to investigate his case. Since the procedural requirements for filing a writ of habeas corpus have been met, I proceed to analyze the substantive grounds of Demarest's ineffective assistance of counsel claim.

### 3. *Ineffective Assistance of Counsel*

#### a. *Legal Standard*

■ To succeed in a claim of ineffective assistance of counsel, a petitioner must meet the two-prong test set forth in *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. Petitioner bears the burden of proving both prongs. *United States v. Rivera*, 900 F.2d 1462 (10th Cir.1990). First, petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. To satisfy the first prong, petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* Second, he must show that counsel's errors prejudiced his defense, specifically "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* Petitioner must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. Petitioner "need not show that counsel's deficient con-

duct more likely than not altered the outcome in the case." *Id.* at 693, 104 S.Ct. at 2068. Rather, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068. Scrutiny of counsel's performance is highly deferential, and "the court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. at 2065. "[E]very effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* Whether Demarest was denied effective assistance of counsel is a mixed question of law and fact and is reviewed *de novo. See United States v. Owens,* 882 F.2d 1493, 1501–02 n. 16 (10th Cir.1989); *see also Case v. Mondragon,* 887 F.2d 1388, 1393 (10th Cir.1989), *cert. denied,* 494 U.S. 1035, 110 S.Ct. 1490, 108 L.Ed.2d 626 (1990).

### b. Counsel's Deficient Performance

█ " '[C]ounsel's function as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case.' ... Because that testing process generally will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies ... 'counsel has a duty to make reasonable investigations *or to make a reasonable decision that makes particular investigations unnecessary.*' " *Kimmelman v. Morrison,* 477 U.S. 365, 384, 106 S.Ct. 2574, 2588, 91 L.Ed.2d 305 (1986) (quoting *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066); *see also Romero v. Tansy,* 46 F.3d 1024, 1029 (10th Cir.) (the duty to investigate is a sixth amendment duty), *cert. denied,* ⸺ U.S. ⸺, 115 S.Ct. 2591, 132 L.Ed.2d 839 (1995) (emphasis supplied). The magistrate judge concluded that Cohan's representation of Demarest was deficient under the Supreme Court standard because: (1) "Cohan lacked the experience and knowledge which should be possessed by any lawyer who would enter into the representation of someone for first degree murder; (2) the mere fact that petitioner himself employed Cohan does not act as a waiver of petitioner's rights to effective assistance of counsel; (3) Cohan's

lack of experience and knowledge renders suspect any decisions and judgments which were made by him; (4) the decisions and judgments which Cohan made cannot legitimately be either presumed or defended as reasonable trial tactics or strategy; and (5) petitioner did not receive a fair trial, and his trial cannot be relied on as having produced a just result." (Recommendation of United States Mag.J. at 22–23.)

#### i. Cohan's Inexperience

█ The magistrate judge found that Cohan's inexperience led him to commit the numerous errors which rendered his defense of Demarest ineffective. (Recommendation of United States Mag.J. at 23–25.) "Cohan was too ignorant to know what he did not know, and [ ] he was too selfish and egotistical to understand the importance of learning what he needed to know," wrote the magistrate judge. (*Id.* at 25.) Respondents correctly state that an attorney's inexperience alone does not make his or her representation deficient. *See United States v. Cronic,* 466 U.S. 648, 665, 104 S.Ct. 2039, 2050, 80 L.Ed.2d 657 (1984) ("The character of a particular lawyer's experience may shed light in an evaluation of his actual performance, but it does not justify a presumption of ineffectiveness in the absence of such an evaluation."). Here, however, I agree with the magistrate judge's conclusion that, as a result of his inexperience, Cohan committed numerous errors which rendered him ineffective.

Because of his unfamiliarity with the state court system and defense of felony charges, Cohan did not know how to conduct a first degree murder trial. His errors, the most serious of which was his complete failure to investigate the case, derived from that inexperience. Cohan should have realized that, given his total lack of experience, he could not handle Demarest's defense on his own. He should have hired or a least consulted with a seasoned attorney, and he should have employed an investigator who knew how to investigate a criminal case. As the magistrate judge observed, "[w]ith no co-counsel[ ] and with no qualified investigator[ ] in the case, the representation of petitioner fell

solely upon the inexperienced and unqualified shoulders of Cohan." (Recommendation of United States Mag.J. at 28.) I agree with the magistrate judge that the errors resulting from Cohan's inexperience and his failure to compensate by consulting experienced professionals are sufficient to rebut the presumption of competence and render his performance deficient.

### ii. Cohan's Closing Argument

█ Cohan's reference to jurors by name at the beginning of his closing argument contributes to his deficient performance under the *Strickland* standard. Any competent attorney would have known, especially after the trial judge's admonition, that he could not incorporate jurors' names into his argument.

█ I disagree with the magistrate judge's suggestion, however, that Cohan's decision to smash his hands into a box of gravel during his closing argument added to his deficient performance within the meaning of *Strickland.* (*See* Recommendation of United States Mag.J. at 15.) Although Cohan's action may have backfired, as the magistrate judge suggests, it was a tactical decision. It is quite possible that the strategy could have succeeded in showing the jury that, contrary to the Prosecution's suggestions, Demarest could easily have scratched his hands by pounding his hands into the gravel driveway during a fit of grief. Accordingly, I agree with respondents that Cohan's smashing his hands into gravel during his closing argument cannot be factored into the deficient performance determination under *Strickland.* (*See* Objections to Mag.'s Recommendation at 22.)

### iii. Failure to Investigate and Interview Witnesses

█ I agree with the magistrate judge's conclusion that Cohan's failure to investigate the State's case against Demarest or consider various defense theories rendered his representation deficient within the meaning of *Strickland.* (*See* Recommendation of United States Mag.J. at 30–33.) The Sheppard defense theory was a strategic choice and would be entitled to deference *if it had been made after thorough investigation. See Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066 ("strategic choices made after thorough in-

vestigation of law and facts relevant to plausible options are virtually unchallengeable"). The evidence indicates, however, Cohan and the disc jockey investigated the Sheppard theory and nothing else. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91, 104 S.Ct. at 2066. Cohan pursued a single defense strategy which was impossible under then-existing law. *See Fletcher,* 566 P.2d at 347. A reasonable attorney would have known that, once Sheppard learned of the plan to accuse her of committing murder on the witness stand, she would invoke her fifth amendment right against self-incrimination. Thus, Cohan should have known that Colorado law would prohibit him from calling Sheppard as a witness. *See id.* As the magistrate judge concluded, "Mr. Cohan's entire defense of petitioner was premised upon facts any reasonable attorney would know were facts that never could be presented in court." (Supplemental Recommendation at 7.) I find that Cohan's failure to investigate further than the Sheppard theory was not a reasonable professional judgment, and it did not justify his failure to fully investigate.

A reasonable attorney would have investigated other defense theories. *See Henderson,* 926 F.2d at 711 ("Reasonable performance of counsel includes an adequate investigation of the facts of the case, consideration of viable theories, and development of evidence to support those theories."). For example, Cohan should have investigated Demarest's alibi. *See Romero,* 46 F.3d at 1029 ("Counsel's failure to investigate a defendant's case, particularly for purposes of an alibi defense, may render his performance constitutionally inadequate.") (citing *Kimmelman,* 477 U.S. at 384, 106 S.Ct. at 2587); *Lawrence v. Armontrout,* 900 F.2d 127, 130 (8th Cir.1990) ("trial counsel owed [defendant] a duty to pursue his alibi defense and to investigate all witnesses who allegedly possessed knowledge concerning [defendant's] guilt or innocence"), *cert. denied,* —— U.S. ——, 115 S.Ct. 1124, 130 L.Ed.2d 1087 (1995). Respondents argue that there is no evidence that Demarest gave Cohan any

leads about alibi witnesses. (Objections to Mag.'s Recommendation at 22.) In his statements to the sheriff's department, however, Demarest maintained that, before he went to the dentist's office, he had drunk coffee at the McDonald's in Westland Mall. (Pet'r's Ex. N at 9.) Neither Cohan nor the disc jockey made any effort, however, to contact any of the McDonald's employees or any one else who might have corroborated Demarest's story. Even if the Sheppard defense theory was reasonable, Cohan would not have been excused from investigating Demarest's alibi. Testimony from alibi witnesses would have bolstered the theory that Sheppard had murdered Hyams. *See Armontrout*, 900 F.2d at 130 ("Testimony from alibi witnesses would bolster rather than detract from a defense of misidentification by negating the inference raised by an eyewitness identification that the defendant had been present at the scene of the crime. A tactical decision to rely on a misidentification defense in no way forecloses the concurrent use of alibi witnesses.").

This case is unlike *Romero*, in which the Tenth Circuit held that an attorney was effective even though he did not investigate every aspect of his client's case. *Romero*, 46 F.3d at 1030. There, the attorney hired an experienced criminal investigator, investigated his client's case "sufficiently to gain a feel for whether an investigation into the suggested alibi would be helpful," and interviewed witnesses. *Id.* at 1029–30. Cohan, on the other hand, did none of these things. Thus, his investigation was insufficient to enable him to make a reasonable determination that further investigation was unnecessary. *See Strickland*, 466 U.S. at 690–91, 104 S.Ct. at 2066. Accordingly, I accept the magistrate judge's conclusion that, because Cohan did not base his judgments about Demarest's defense on reasonable or responsible decisions, his handling of the trial cannot properly be characterized as tactical or strategic. (*See* Recommendation of United States Mag.J. at 33.)

A reasonable attorney representing Demarest would have investigated the State's case against him and interviewed its witnesses. *See Kimmelman*, 477 U.S. at 384, 106 S.Ct. at 2588; *Henderson*, 926 F.2d at 711 ("Counsel has 'a duty ... to investigate

all witnesses who allegedly possessed knowledge concerning [the defendant's] guilt or innocence.'") (alteration in original) (quoting *Armontrout*, 900 F.2d at 130). Had Cohan investigated the scientific aspects of the State's case and attempted to interview its expert witnesses, he would have understood the nature of the scientific evidence prosecutors intended to use against Demarest. With that understanding, he would have been able to conduct an investigation in an attempt to refute that evidence. For example, Cohan could have consulted experts such as Dr. Kennedy, the fluid-dynamics expert who testified at the evidentiary hearing, in effort to ascertain the reliability and probative value of Detective Hopkins' conclusions from the blood-spatter evidence. Because Cohan did not investigate the State's case, he was unprepared to counter the inferences prosecutors drew from the evidence and allowed prosecutors' interpretations to go to the jury unrefuted. Similarly, had Cohan interviewed the State's witnesses, like Bausch and Davidson for example, he would have been prepared to clarify their testimony for the jury through cross-examination. In this way, he could have precluded any negative inferences the Prosecution was able to draw from vague testimony.

A reasonable attorney would have investigated Demarest's emotional breakdowns on the day of Hyams' murder and during the February 12, 1981, interrogation. Cohan should have interviewed and considered calling as witnesses the doctors at St. Anthony's who treated Demarest for adult situational reaction. Dr. Rehg's testimony at the evidentiary hearing indicates that there was a medical explanation for Demarest's reactions—he appeared to have broken down as a result of the acute stress brought on by his discovery of the body of his murdered friend and the police interrogation. (*See* Evidentiary Hr'g Tr. at 174–76.) By failing to inform jurors of the details of the adult situational reaction diagnosis, Cohan gave them no alternative to the Prosecution's argument that Demarest reacted as he did out of guilt.

Respondents suggest that Cohan made a tactical decision not to introduce evidence regarding Demarest's "psychological epi-

sodes." (Written Argument on Evidence at 3 [filed Dec. 6, 1994].) Without having conducted any investigation into those "episodes," however, Cohan could not have reasonably made a strategic decision to withhold evidence about the breakdowns at trial. *See Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2066.

As the Supreme Court has explained, "[t]he right to the effective assistance of counsel is ... the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing." *Cronic,* 466 U.S. at 656, 104 S.Ct. at 2045. "[I]f counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of sixth amendment rights that makes the adversary process itself presumptively unreliable." *Id.* at 659, 104 S.Ct. at 2047. Because he failed to investigate the Prosecution's evidence against Demarest, Cohan was unprepared to attack that evidence or offer evidence contradicting the conclusions prosecutors drew from it. Consequently, Cohan failed to subject the State's case against Demarest to the "meaningful adversary testing" envisioned by the Sixth Amendment. In so doing, he deprived Demarest of a fair trial. Thus, as the magistrate judge concluded, the outcome of the trial Demarest received is presumptively unreliable. *See id.* Nevertheless, I consider the prejudicial effect of Cohan's errors and omissions.

#### c. Prejudice

■ In analyzing an ineffective assistance of counsel claim, "the performance of defendant's counsel 'must be considered in light of the strength of the government's case.' " *Rivera,* 900 F.2d at 1474 (citing *Eggleston v. United States,* 798 F.2d 374, 376 [9th Cir.1986] ). The magistrate judge considered the prejudice prong of the *Strickland* test in light of the circumstantial nature of the State's case against Demarest. (Supplemental Recommendation at 4–5.) I agree that the absence of any evidence directly linking Demarest to Hyams' murder accentuates the prejudicial impact of Cohan's failings. *(See id.)*

#### i. Cohan's Inexperience

I agree with respondents that Cohan's lack of experience alone did not prejudice Demar-

est. *See Cronic,* 466 U.S. at 665, 104 S.Ct. at 2050; *Paradis,* 954 F.2d at 1491. As explained below, however, I find that the failings resulting from his inexperience prejudiced Demarest within the meaning of *Strickland.*

#### ii. Cohan's Closing Argument

■ Cohan's inappropriate reference to jurors by name alone might not have prejudiced Demarest under *Strickland.* Coupled with his other failings, however, the incident further helped to erode the credibility of Demarest's claim of innocence in jurors' eyes.

#### iii. Failure to Investigate

■ As the magistrate judge suggests, Cohan's chief failure was his neglect to investigate Demarest's case. Had Cohan investigated the State's evidence and considered alternative defense theories, he could have presented the jury with reason to doubt the State's interpretations of its evidence. As it was, Cohan allowed the Prosecution's case to go unrebutted. Had the jury been given a reason not to accept the conclusions the State drew from its circumstantial evidence, it is likely that the outcome of Demarest's trial would have been different. This case is akin to *Henderson,* in which the Eighth Circuit found that "[h]ad the jury been aware of all the facts surrounding the murder [ ], it would have been presented with significant doubts about [defendant's] guilt. Without the evidence presented before the district court, the jury that convicted [defendant] had no reason to question the inferences the state drew from its circumstantial case." *Henderson,* 926 F.2d at 712.

If Cohan had investigated the State's scientific evidence, he would have been in a position to counter it at trial. For example, he could have hired experts such as Dr. Kennedy to counter the interpretations of the evidence made by the Prosecution's experts. Respondents mischaracterize the magistrate judge's recommendation as suggesting that Demarest was prejudiced simply because Cohan could have called an expert more qualified in blood spatter evidence than Detective Hopkins. *(See* Objections to Mag.

J.'s Supplemental Recommendation at 17–19.) The magistrate judge explained, and I agree, that Cohan erred in failing to investigate the State's scientific evidence, its blood spatter evidence for example, and, as a result of his error, the jury was given no alternative interpretation of the State's evidence. If the jury had heard someone like Dr. Kennedy attack Deputy Hopkins' blood-spatter analysis, it would have had reason to doubt the State's conclusion that there was an interval of time, indicating deliberation, between the bludgeoning and strangulation, and the final stabbing. Because of Cohan's failure to investigate and present evidence to counter the State's conclusions about how Hyams was killed, the jury had no alternative but to accept the Prosecution's arguments regarding the scientific evidence.

Respondents argue that the forensic and scientific evidence was not a central issue at trial. (Objections to Mag.'s Recommendation at 8–10.) They concede, however, that the evidence was crucial to the prosecutors' argument that Demarest premeditated Hyams' murder. (*Id.* at 8.) Respondents further acknowledge that, had Cohan successfully attacked the scientific evidence, the jury would have found Demarest guilty of a homicide under a lesser mental state. (*Id.* at 8–9.)

Respondents also suggest that Cohan could have reasonably elected to not investigate the scientific evidence because arguing that Demarest was guilty of second degree murder or manslaughter would be inconsistent with Demarest's claim of complete innocence. (*Id.* at 9.) Cohan's own testimony, however, contradicts respondents' inference regarding the reason for his failure to investigate. Cohan's testimony at the rule 35(c) hearing indicates that he did not investigate the scientific or forensic evidence because he and the disc jockey were wedded to the Sheppard theory. Respondents' suggestion that his motivation was otherwise is purely speculative, absolutely unsupported by the record.

Furthermore, the Prosecution used its scientific evidence to suggest that Hyams' killer was a tall, strong man—characteristics which the jury could see Demarest possessed. (Tr. of Trial at 678, 680, 682, 696.) As the magistrate judge observes, had Cohan investigated the forensic and scientific evidence, it is possible that he could have presented evidence rebutting the State's implication that Demarest was the killer. (*See* Supplemental Recommendation at 28.)

I agree with the magistrate judge's conclusion that Cohan's pursuit of the Sheppard theory, a strategy any competent attorney would have realized could not be successfully presented at trial in light of *Fletcher*, 566 P.2d at 347, clearly prejudiced Demarest. (*See* Supplemental Recommendation at 6–9.) By spending so much time on an unviable defense theory, Cohan had little time for useful trial preparation. Respondents are correct that Cohan's mere choice of the Sheppard defense did not prejudice Demarest to the extent that he was deprived of a fair trial. (*See* Objection to Mag.J.'s Supplemental Recommendation at 4–6.) Rather, as the magistrate explained, it was Cohan's failure to investigate the State's case or the possibility of defenses other than the Sheppard theory which prejudiced Demarest within the meaning of *Strickland*. Had Cohan pursued other defense possibilities and interviewed the State's witnesses, he might have been prepared with an alternative theory when the trial judge prohibited him from presenting the Sheppard defense. For example, he might have based his theory of Demarest's innocence on an alibi witness had he considered the possible existence of such a person. As it was, after the judge ruled that Sheppard could not testify, Cohan left Demarest mid-trial with no defense whatsoever.

### iv. Failure to Interview Witnesses

Cohan's failure to interview the Prosecution's witnesses left him unprepared to call into doubt inferences drawn by the prosecutors or elicit testimony favorable to Demarest. Had Cohan interviewed the State's experts, he would have better understood the circumstantial nature of the State's evidence and been in a significantly better position to emphasize to the jury the lack of evidence tying Demarest to the crime. I agree with the magistrate judge that, as with Cohan's overall failure to investigate, his neglect to interview the State's witnesses left the jury with an inaccurate representation of the available facts. See *Henderson*, 926 F.2d

at 712. For example, if Cohan had interviewed the State's expert witnesses, he would have understood the nature of the forensic and scientific evidence offered against Demarest and been able to consult experts of his own in preparing to attack it. Had Cohan done this, he could have provided jurors with information, such as that provided by Dr. Kennedy at the evidentiary hearing, which would have given them reason not to accept the State's suggestions that the scientific evidence pointed to Demarest.

As the magistrate judge observes, the prejudice resulting from Cohan's failure to interview witnesses is particularly apparent with respect to the State's witnesses who testified regarding the scratches on Demarest's hands. (*See* Supplemental Recommendation at 9–12.) Had Cohan interviewed Eileen Bausch and Mark Davidson prior to trial, he would have been able to clarify their testimony for the jury. Because he did not know what their testimony would be until they were on the witness stand, however, Cohan could only "play by ear" his cross-examinations of them. By failing to elicit precisely what Bausch and Davidson did and did not see regarding Demarest's hands, Cohan allowed the Prosecution to interpret their testimony in a light least favorable to Demarest. Bausch's testimony at the evidentiary hearing indicates that, had Cohan interviewed her before trial, he could have countered the Prosecution's suggestion that Bausch did not see Demarest's hands because he hid them from her with clear testimony that she saw the hands but did not remember seeing scratches on them. (*See* Evidentiary Hr'g Tr. at 139, 151–52.) In this way, Bausch's testimony would have had a neutral or possibly favorable impact on Demarest's case rather than the negative impact prosecutors were able to create as a result of Cohan's ineffective cross-examination. Similarly, had Cohan met with Davidson prior to trial, he might have been able to follow-up, during cross-examination, on what Davidson had begun to say, prior to the prosecutor's interruption, regarding what he remembered seeing Demarest do with his hands. Davidson's testimony at the evidentiary hearing indicates that, had Cohan interviewed him prior to trial, he might have

given testimony favorable to Demarest. (*See id.* at 162–63.)

Respondents argue that, because the testimony Bausch and Davidson gave fourteen years ago is more reliable than that given at the evidentiary hearing, Cohan's failure to speak with them prior to trial cannot constitute prejudice within the meaning of *Strickland.* (*See* Objection to Mag.J.'s Supplemental Recommendation at 10–13.) To be sure, testimony fourteen years after the relevant events is usually less reliable than testimony given only a few months later. It was not the fact that Bausch and Davidson would have testified *differently* at trial had Cohan interviewed them, however, that prejudiced Demarest with the meaning of *Strickland.* Rather, it was Cohan's failure to *clarify* their testimony and, in so doing, preclude the negative inferences drawn by the Prosecution which prejudiced Demarest to the point that it undermined his ability to receive a fair trial. By failing to prepare for cross-examination of Bausch and Davidson, Cohan did not present the jury with a clear picture of all of the facts potentially favorable to Demarest. Had Cohan elicited from Bausch testimony that she had seen Demarest's hands but did not remember whether she saw scratches on them, it is reasonably possible that the jury could have inferred that there were no scratches on Demarest's hands because Bausch would have noticed if there had been. Similarly, if Cohan had given Davidson an opportunity to fully explain what he remembered about Demarest's hands, there is a reasonable possibility that Davidson's testimony would have offered some support for Demarest's claim that he scratched his hands in the gravel driveway. If Cohan had interviewed Bausch and Davidson and been able to elicit testimony bolstering Demarest's claim as to how he scratched his hands, there is a reasonable possibility that the jury would have had significant doubts about the Prosecution's theory that Demarest received the scratches during a struggle with Hyams. Accordingly, I conclude that Cohan's failure to interview the State's witnesses prejudiced Demarest within the meaning of *Strickland. See Henderson,* 926 F.2d at 712–13.

#### v. *Failure to Present Medical Evidence in Suppression Argument*

Regarding Demarest's assertion that he was prejudiced by Cohan's failure to present testimony from Demarest's psychiatrists in arguing that the statements to the sheriff's deputies should be suppressed, I agree with the magistrate judge's finding that, although the failure constituted error, there is no evidence of resulting prejudice. (*See* Supplemental Recommendation at 32–34.) Under *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), a defendant's mental condition cannot justify suppression of his statements to police absent evidence of police coercion. Contrary to Demarest's arguments, (*See* Supplemental Br. at 16 [filed Nov. 28, 1994] ), the deputy sheriffs do not appear to have exploited Demarest or otherwise unconstitutionally manipulated him during the interrogations. (*See* Pet'r's Exs. N, O.) Although *Connelly* was decided in 1986, after Demarest's trial, its holding must be applied on habeas review. *See Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

#### vi. *Failure to Present Medical Evidence Regarding Competency*

After reviewing the record, I accept the magistrate judge's conclusion that it contains insufficient evidence to determine whether Demarest was prejudiced by Cohan's failure to present medical evidence indicating that Demarest was incompetent at trial due to recent colo-rectal surgery. (*See* Supplemental Recommendation at 34–35.)

#### vii. *Failure to Present Medical Evidence at Trial*

As the magistrate judge found, if Cohan had investigated the reason behind Demarest's emotional breakdowns following Hyams' murder and informed the jury of the psychiatric explanation for the breakdowns, he could have countered the State's suggestion that Demarest reacted out of guilt. (*Id.* at 35–36.) Contrary to respondents' argument that evidence of Demarest's mental state does not create an inference of innocence, such evidence would have negated or at least called into question what respondents acknowledge was the Prosecution's suggestion that Demarest reacted out of remorse

rather than grief. (*See* Objection to Mag.J.'s Supplemental Recommendation at 20.) Respondents' suggestion that, even if presented with the evidence of the adult situational reaction diagnosis, "[m]ost jurors ... would find it remarkable that the death of an adult friend (who was neither a spouse nor a relative) could cause grief of sufficient magnitude to require hospitalization," (*see id.* at 21), is pure speculation. Respondents' further argument that Cohan made a tactical decision within the meaning of *Strickland* to forgo presenting any psychological evidence, (*id.*), fails because Cohan never investigated the evidence regarding Demarest's mental state, (Rule 35[c] Hr'g Test. at 16–18). *See Strickland*, 466 U.S. at 690–91, 104 S.Ct. at 2066.

As the magistrate judge observes, Dr. Rehg's testimony would have served as "powerful evidence to confirm that [Demarest's] psychological state following his discovery of the body was a true, not feigned, breakdown." (Supplemental Recommendation at 35–36.) Similarly, Dr. Vedeal's testimony would have made clear to the jury that the medications Demarest was taking when he was interrogated could have "affect[ed] and influence[d] the manner in which [he] would react to questioning and to stress." (*Id.* at 36.) Such evidence would have given jurors an alternative to the State's explanation for any inconsistencies in Demarest's statements to deputy sheriffs. As it was, Cohan's failure to interview Demarest's psychiatrists and call them as witnesses left the jury with no alternative to the State's explanation for Demarest's slightly inconsistent statements and his curling into a fetal position, tightening his muscles, and clenching his fists.

#### d. *Cumulative Effect of Cohan's Failings*

I conclude that Cohan's failure to investigate the State's case against Demarest, consider alternative defense theories, interview the Prosecution's witnesses, and present the jury with medical evidence relating to Demarest's psychological state in the days following Hyams' murder materially prejudiced Demarest. Each of these failings calls into serious doubt the fairness and accuracy of Demarest's trial. Viewed together, Cohan's errors overwhelmingly demonstrate that the

trial Demarest received cannot be relied upon as a measure of his guilt or innocence of Hyams' murder. Absent Cohan's failings, there is a reasonable probability that the outcome of Demarest's trial would have been different. Because I conclude that Demarest received ineffective assistance of counsel at trial in violation of the Sixth Amendment, I need not reach the other grounds on which he requests habeas relief.

### 4. Stay of Order

■■■ The magistrate judge has recommended that the court stay any order granting habeas relief for a period of ninety days. "Generally, a district court ruling in the petitioner's favor in a habeas case provides a reasonable time in order to afford the State an opportunity to re-try the defendant or otherwise correct the constitutional infirmity." *Bowen v. Maynard*, 799 F.2d 593, 614 n. 12 (10th Cir.1986) (citations omitted), *cert. denied*, 479 U.S. 962, 107 S.Ct. 458, 93 L.Ed.2d 404 (1986). Thus, I agree with the magistrate judge that the court's order granting relief should contain a mechanism which would allow the State to correct the Sixth Amendment violations which infect Demarest's conviction. A stay, however, introduces an unneeded ambiguity concerning the date on which there is a final judgment of this court for purposes of appeal, and it also introduces other unnecessary ambiguities.[6] It is my intent that the judgment entered on

this order be final for all purposes. I will therefore simply order that Demarest be *unconditionally and permanently* released from the custody of the state of Colorado, *on his present conviction*, upon the commencement of proceedings to retry him on the underlying charges or upon the expiration of sixty days from the date the clerk enters judgment on this order—whichever is earlier. During this period the State may commence proceedings to retry Demarest, if it so desires. If the State elects to commence such proceedings without appealing this court's judgment, then respondents will forthwith release Demarest from custody on the conviction at issue here, and the terms and conditions of his release during the proceedings can be set by the state court conducting the proceedings. If respondents appeal this court's judgment, then the terms and conditions of Demarest's release pending appeal will be set by this court. *See* Fed.R.App.P. 23(c).

### 5. Bond

Also before me is Demarest's motion for release on bond pending resolution of his habeas action in this court. By virtue of my order granting Demarest habeas relief, his petition is no longer pending before this court. Thus, the question of whether he should be released pending ruling on his

---

6. *Burton v. Johnson*, 975 F.2d 690 (10th Cir. 1992) exemplifies the complications which can arise when the writ is granted but conditioned in some way on a retrial. There, the district court granted the writ and ordered petitioner's release "unless a new trial [was] commenced within 90 days." Both parties appealed the judgment, which was ultimately affirmed by the court of appeals. While the appeal was pending, however, petitioner was released from custody and immediately arrested on a bench warrant on the underlying murder charge. The federal district court, claiming exclusive jurisdiction over the petitioner's conditions of release, held the arrest unlawful. Respondent then moved for a stay of the ninety-day period during which it could retry petitioner, and the district court denied the motion. Respondent did not appeal this decision. Consequently, the original ninety-day period was not tolled and expired while the appeal was pending.

When the court of appeals' mandate affirming the judgment was filed in the district court, petitioner commenced a second habeas action, arguing that the ninety-day period for retrial had

expired and that she was entitled to an unconditional release. Respondents argued that the court of appeals had mandated a new trial by affirming the original district court judgment which had included the condition that petitioner could be retried. The district court, apparently believing that the court of appeals had mandated a new trial, agreed and dismissed the second habeas petition. On appeal from this decision, the court of appeals held that it had not mandated a new trial but had merely affirmed the judgment which was before it on appeal and had not addressed the conditional nature of that judgment (because the issue had not been raised). It also found that the judgment was ambiguous as to whether the district court intended to authorize petitioner's conditional release until a new trial was eventually held or whether it intended to order petitioner's *permanent discharge* if a new trial were not commenced within ninety days. It therefore vacated the dismissal of the second habeas petition and remanded the case with instructions for the district court to "interpret, clarify, and enforce its judgment in the underlying case." *Burton*, 975 F.2d at 694.

petition is now technically moot. Nevertheless, his motion is broad enough to encompass a request that he be released (1) during the period between entry of judgment and his unconditional and permanent release from custody on his constitutionally infirm conviction and (2) during any appeal of this court's judgment. I therefore proceed to consider his motion as a motion for bond during these time periods.

 "A court has broad discretion in conditioning a judgment granting habeas relief." *Hilton v. Braunskill,* 481 U.S. 770, 775, 107 S.Ct. 2113, 2118, 95 L.Ed.2d 724 (1987). Where the court grants a writ of habeas corpus but does not order immediate release, as here, it may elect to release the petitioner on bond. *See Woods v. Clusen,* 637 F.Supp. 1195, 1197 (E.D.Wis.1986) ("The power of the district court to order enlargement of the successful habeas corpus petitioner 'is not diminished where . . . the writ is conditionally granted.' ") (citation omitted).

 On September 3, 1993, the magistrate judge conducted a hearing on Demarest's motion for release on bond. (Tr. of Bond Hr'g [filed Oct. 8, 1993].) Witnesses testified on Demarest's behalf as follows: (1) Debbie Cisneros, a Denver attorney for whom Demarest worked while incarcerated, testified that she believed Demarest was not a flight risk or danger to the community and planned to employ him at her law office if he were released on bond, (*id.* at 5–12); (2) Michael R. Frieman, a friend of Demarest, stated that Demarest could stay at his home upon release and believed that he was neither a flight risk nor a danger to the community, (*id.* at 13–18); (3) Demarest's father, Stephen Demarest, testified that his son was not a flight risk and that he and Demarest's mother would post their home (which they own free and clear, and which is valued at over $100,000) as surety to guarantee Demarest's compliance with all bond conditions, (*id.* at 19–22); (4) James Scarboro, an attorney who worked with Demarest on Demarest's successful appeal to the United States Supreme Court regarding a witness fee issue, testified that Demarest was skilled in performing legal research and did not represent a flight risk or danger to the community, (*id.* at 22–27); (5) Jeff Hartbauer, a correctional specialist at the Arkansas Valley Correctional Facility, testified that Demarest's prison file indicated that he had no problems while in prison and had been an "excellent employee" at the prison law library, (*id.* at 27–35); (6) Nard Robinette, a program manager at the Arkansas Valley prison, testified that Demarest was very helpful in setting up the law library there and always displayed a positive attitude and showed him respect, (*id.* at 36–41); (7) Clifford Barnard, a Denver attorney for whom Demarest worked while in prison and who set up an educational trust fund for Demarest, testified to Demarest's strong character and to his belief that Demarest was not a flight risk or a danger to the community, (*id.* at 41–51); and (8) Demarest testified, *inter alia,* that he (a) hoped to vindicate himself through his habeas action and on retrial, (b) had completed several educational programs during his imprisonment, (c) was enrolled in a three-year program to earn a combined Bachelor of Science and Juris Doctor degree, (d) would be eligible for parole in 2001, (e) aspired to become a licensed attorney, and (f) would present neither a risk of flight or danger to the community if released on bond, (*id.* at 53–73).

At the hearing, the State called as its only witness Dennis Hall, an attorney from the District Attorney's office for Jefferson and Gilpin Counties who handled Demarest's state post-conviction actions. (*Id.* at 73–82.) Mr. Hall testified that: (1) the State will retry Demarest if he is granted habeas corpus, (*id.* at 76–77); (2) most people facing a charge carrying the possibility of a long sentence are a flight risk, (*id.* at 78); and (3) Demarest's trial indicated that he suffered from an emotional problem, making him a risk to the community, (*id.* at 78–79). Hall's testimony was general and did not address Demarest's current circumstances.

After considering the testimony taken at the bond hearing and finalizing his recommendation regarding Demarest's habeas petition, the magistrate judge recommended that bond be set pending consideration of Demarest's petition for habeas relief. (Recommendation for Setting of Bond [filed Aug.

4, 1995].) He summarized his reasoning as follows:

> The Attorney General argues that the petitioner presents a flight risk, but presented no evidence which would tend to support that claim, beyond the obvious fact that the petitioner would be a person who would stand charged with the offense of first degree murder. On the other hand, the testimony of the witnesses who were called by the public defender on behalf of the petitioner demonstrates that there is strong opinion among them in regard to the petitioner's character, particularly whether he would have any propensity to flee from the jurisdiction to avoid prosecution or sentence. Many of the witnesses were lawyers, and I find that their testimony was believable and compelling.
>
> The testimony of the petitioner's witnesses demonstrates that there is no evidence upon which I could conclude that the petitioner was likely to flee the jurisdiction, and there was an abundance of evidence which convinced me that such a prospect is very unlikely. He has already served the majority of his life sentence, with a parole eligibility date of approximately five years away; his parents have agreed to post all of the equity in their home, an amount which exceeds $100,000; the petitioner has a residence and employment secured and waiting for him; and it is clear that the petitioner has a support system among a significant number of lawyers here in Colorado.

(*Id.* at 7–8.) [7]

Since the bond hearing, Debbie Cisneros has been in a serious car accident and is no longer practicing law. (Mot. for Expedited Ruling on Mag.'s Recommendation for Bond Release at 2 [filed Sept. 6, 1995].) However, Demarest asserts that Denver attorneys Clifford Barnard and David Lane have offered him paralegal/law clerk and legal research jobs. (*Id.* at 2–3.) Respondents have not challenged that assertion.

After reviewing the transcript of the bond hearing and the entire record relating to Demarest's conviction, I find that: (1) De-

marest has already served the majority of his pre-parole-eligibility sentence (fourteen of twenty years); (2) the circumstantial nature of the State's case indicates a likelihood of Demarest's acquittal on retrial; (3) Demarest's prison record indicates that he is a hard-working, intelligent, and non-violent individual who will not pose a danger to the community; (4) Demarest will have employment and a place to live upon release; (5) Demarest's commitment to vindicating himself through a retrial as well as the family and community support he enjoys indicate that he is not a flight risk; and (6) an agreement to forfeit property having an unencumbered value of $100,000 in the event that Demarest should violate any term or condition of his release provides adequate assurance that he will appear at future court proceedings and will obey all other conditions of his release. In light of these findings, I conclude that Demarest should be released on bail (1) during the period between entry of judgment and his unconditional release from custody under the terms of this order and (2) during any appeal of this court's order.

### 6. Conclusion

Based on the foregoing, it is therefore ORDERED as follows:

(1) The magistrate judge's recommendation is hereby ACCEPTED.

(2) Demarest's petition for a writ of habeas corpus is hereby GRANTED. Upon the commencement of further proceedings on the underlying charges or upon the expiration of sixty days from the entry of judgment on this order (whichever is earlier), respondents will forthwith permanently and unconditionally release petitioner from custody on the conviction at issue in this case.

(3) The court, having determined that Demarest should be released on the posting of a property bond in the amount of $100,000, will hold a further hearing on Demarest's motion for a bond at which other conditions of bond will be set and a written Order Setting Conditions of Release will be executed. The

---

7. The pages of the magistrate's recommendation regarding bond are unnumbered. The quoted passage occurs on the seventh and eighth pages.

hearing will be held commencing at 11:00 o'clock a.m. on November 22, 1995. Respondents shall secure petitioner's presence at the hearing.

(4) All pending motions not expressly addressed herein are DENIED as moot.